FILED
COURT OF APPEALS
DIVISION II

2015 MAY -5 AM 9: 25

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| IN RE WELFARE OF | No. 45809-8-II |
| K.M.M.,† | |
| Minor Child. | PUBLISHED OPINION |

LEE, J. — On January 14, 2014, the juvenile court entered an order terminating J.M.'s[1] parental rights to K.M.M. J.M. appeals the juvenile court's order, arguing that the Department of Social and Health Services failed to prove that all services reasonably capable of correcting parental deficiencies were expressly and understandably offered or provided. J.M. also argues that the juvenile court's order violates his right to due process because the juvenile court failed to make a finding that he was currently unfit to parent K.M.M. Under the facts of this case, the Department proved that all necessary services were expressly and understandably offered or provided. And, the juvenile court made an explicit finding of unfitness by finding that J.M. is unable to parent K.M.M. Accordingly, we affirm the juvenile court's order terminating J.M.'s parental rights.

## FACTS

J.M. and D.C. are the parents of K.M.M., a girl born in 2002, and K.M., a girl born in 2008.[2] K.M.M. and K.M. were removed from their parents' custody in February 2009, and they

---

† To provide confidentiality, we order the use of the minor's initials in the case caption and in the body of the opinion. 2006-1 General Order of Division II.

[1] We use initials to protect privacy interests.

[2] D.C. voluntarily relinquished her parental rights and is not a party to this appeal.

were found to be dependent children in April 2009. In July 2009, K.M.M. and K.M. were placed with K.M.M.'s current foster parents. When K.M.M. entered dependency care she was parentified, meaning she tried to take care of her younger siblings rather than relying on adults. She also had no attachment to adults and did not know how to trust or rely on adult caregivers.

A.    PROGRESS DURING DEPENDENCY

In September 2009, K.M.M. began individual therapy with Cory[3] Staton. Staton began working with K.M.M. on forming appropriate attachments with adults, accepting adults as her caregivers, and reducing her parentified behavior. Because K.M.M.'s parents were unable to care for her at the time, Staton worked with K.M.M.'s primary caregivers (K.M.M.'s foster parents) during her therapy. Staton gave K.M.M.'s foster parents tools for working with K.M.M. and for encouraging her to form appropriate attachments with adult caregivers.

During the dependency, J.M. was ordered to engage in a drug and alcohol evaluation and to follow all recommended treatment. J.M. also was ordered to engage in mental health treatment, parenting classes, and a domestic violence assessment. K.M.M. and K.M. had visitation with J.M. and D.C.

In 2010, D.C. gave birth to K.C. K.C. was removed from her mother's care and placed in the same foster home as her half-sisters.

In June 2011, the Department filed a petition for termination of parental rights as to K.M.M., K.M., and K.C. But the Department took a voluntary nonsuit of the petition in February 2012.

---

[3] We note there are several different spellings of Cory Staton's name in the record. We are using "Cory" in this opinion.

On February 24, 2012, the dependency court entered a new dependency review hearing order. The order stated that J.M.'s drug treatment services were completed and no longer needed. J.M. was ordered to continue attending therapy at Kitsap Mental Health. The order also continued weekly visitation between K.M.M. and J.M. The order stated that "[p]arents can participate in counseling as appropriate and recommended by counselor." Clerk's Papers (CP) at 320 (Ex. 12). Finally, the dependency court ordered monthly meetings between the parents, social worker, guardian ad litem (GAL), and attorneys to make sure they "stay on track for plan of reunification." CP at 321 (Ex. 12).

B.     K.M.M.'s RELUCTANCE TO VISIT PARENTS

In March 2012, K.M.M. began expressing reluctance about visiting with her parents. In April, K.M.M. completely refused to visit with her parents. The Department held meetings in order to brainstorm ways to encourage K.M.M. to attend visits. However, the attempts to get K.M.M. to attend visits were unsuccessful

On July 5, the dependency court ordered that:

[A] family therapist is necessary on this case to render an opinion on the appropriateness of visitation, and how such visitation can occur, after consultation with the parents, the parties, and the child. The parties agree that Tom Sherry shall provide this opinion to the parties and the court on parental visitation with [K.M.M.].

CP at 324 (Ex. 13). The dependency court also appointed an attorney for K.M.M.

After speaking to all the parties and reviewing the case, Sherry recommended a plan for "natural contact" between K.M.M. and her parents. 2 RP at 241. Sherry recommended that, after KMM's sisters were transitioned into D.C.'s home, the parents could be present when the social worker brought K.M.M. for a sibling visitation. Sherry also recommended that there only be

3

incidental, passive contact between K.M.M. and her parents as they were "coming[] and going[] as a way to soften that impasse." 2 Report of Proceedings (RP) at 239.

In October 2012, the Department began a structured plan to transition K.M. and K.C. back into D.C.'s home. The Department began implementing Sherry's recommended "natural contact" between K.M.M. and her parents. Although K.M.M. had visits with her sisters, she continued to refuse to visit with either of her parents.

K.M.M's first two visits with her siblings involved D.C.; J.M. was not present. The "natural contact" went as planned, although K.M.M. did not engage with D.C. K.M.M.'s first "natural contact" visit with J.M. was in December 2012. When the van arrived with K.M.M., J.M. saw K.M.M. hiding in the back of the van. He opened the back of the van and put his hands on her shoulders. K.M.M.'s social worker terminated the visit. After the incident, the dependency court suspended visitation.

C.    TERMINATION PETITION

On February 21, 2013, the Department filed a petition for termination of J.M.'s parental rights to K.M.M. On March 20, the dependency court entered a permanency planning order. The dependency court noted that "the child's [therapist] recomended [sic] only natural contacts which did not go well." CP at 343 (Ex. 15). The dependency court ordered that visitation remain suspended because it found "visitation with [J.M.] to be a threat to [the] child's health, safety, or welfare." CP at 348 (Ex. 15). The only service that was ordered for J.M. was to continue with mental health counseling. The primary permanency plan was adoption, with an alternative plan to return home.

4

On August 19, the dependency court entered another dependency review hearing order. The dependency court ordered J.M. to continue participation in mental health counseling. The dependency court denied J.M.'s request for reunification.[4] As to visitation, the order stated:

> At this time the department is recommending that the visitation between [K.M.M.] and her parents remain suspended. She continues to refuse this contact despite attempts to come up with opportunities/options for contact in a more restrictive fashion. During the sibling visitation in May of 2013 she became fearful when she believed she was going to see [D.C.] and reports she again hid under the table. She has refused sibling visits since this time.

CP at 360 (Ex. 16).

D.     TERMINATION TRIAL

The termination trial began on October 29, 2013. The juvenile court heard the following testimony.

1.     Christopher Richardson – Social Worker

Christopher Richardson was the social worker assigned to K.M.M.'s case from late 2011 until the summer of 2012. When Richardson was assigned the case, J.M. had completed most services but was still presenting with mental health concerns. After February 2012, Richardson began the process of setting up consistent mental health treatment for J.M. Until that point

---

[4] There is a paragraph under the services portion of the order that reads:

> The father will maintain a relationship with the service providers for his daughter. He will engage in learning opportunities/therapy with his daughter as they are appropriate. To include [Parent-Child Interactive Therapy] if/when recommended.

CP at 358 (Ex. 16). The paragraph, however, is crossed out and next to it there is a notation that reads: "Counsel for father requested reconciliation/reunification services and these were denied by court." CP at 358 (Ex. 16).

5

arranging mental health treatment had been delayed due to scheduling and communication issues. Richardson also arranged for J.M. to participate in Project Safe Care.[5]

K.M.M. was continuing to attend individual therapy with Cory Staton to address social and emotional development as well as concerns regarding parentification. While Richardson was assigned the case, the dependency court ordered that J.M. could participate in K.M.M.'s therapy if appropriate and recommended by her counselor. K.M.M.'s therapist did not recommend that J.M. participate in K.M.M.'s therapy during the time Richardson was the assigned social worker.

Richardson testified that from February until April 2012, K.M.M. attended visitation. The visits overall were normal, but K.M.M. appeared withdrawn at times. K.M.M. did not ask to end any visits early. But, in mid-April, K.M.M. began ending visits early or refusing to go. When K.M.M. began resisting visitation, the parties began brainstorming ways to get her to attend visits including more individual visits (instead of with her sister, K.M.) and community visits. But, K.M.M. continued refusing to attend visits. In July, after attempts to get K.M.M. to resume visitation failed, the dependency court ordered the evaluation with Sherry. Shortly thereafter, K.M.M.'s case was reassigned to another social worker. When Richardson was leaving the case, he noted that K.M.M. had "made up her mind on what she wanted for herself, and it didn't appear, at that time, to include reunification with her parents." 1 RP at 34. Richardson had never had a case where a child has taken as strong a position as K.M.M. has in this case.

_____

[5] Project Safe Care is a skill development program for parents to learn about creating a safe home environment and developing relationships with the child or children.

2.    Cory Staton – K.M.M.'s Therapist

K.M.M. began individual therapy with Cory Staton in September 2009. Staton testified that K.M.M. presented with insecure attachments and inability to rely on adults as caretakers. K.M.M. also presented with some emotional delays, including an inability to express her feelings. K.M.M. was also parentified, meaning that she tried to take care of her younger siblings rather than relying on adults. Staton testified that parentified behavior is addressed "[t]hrough learning to trust caretakers to meet [children's] needs, that the caretakers are going to meet their needs and keep them safe, physically and emotionally." 1 RP at 65. Staton began treating K.M.M. by engaging in play therapy. She also encouraged K.M.M.'s foster parents to model how to identify and express feelings. Staton also worked with K.M.M.'s foster parents so that they could help K.M.M. "heal in the home environment as well." 1 RP at 67.

Staton further testified that the standard practice for working with children with attachment issues is to work with the child's current caretakers first, and then begin working with the child's biological parents when the biological parents are transitioning into the role of the child's primary, reliable caretakers. The focus of the child's therapy is teaching them to attach to and rely on their caretakers, whether the caretaker is the child's foster parents or the child's biological parents. Staton explained that once a child has learned how to rely on adults and create secure attachments then the process of transitioning the child home works on transferring and building trust and attachments between the child and the biological parents. Creating secure attachments with K.M.M.'s foster parents facilitated her ability to form other attachments. The work with K.M.M.'s foster parents did not exclude or eliminate her secure attachment with other adults. However,

7

Staton testified that she did not work with J.M. because, as far as she knew, K.M.M. was never being transitioned back into J.M.'s care.

Staton testified that, at the time of trial, K.M.M. had a very secure attachment to her foster family and she identified them as her family. Staton also testified that breaking K.M.M.'s secure attachment with her foster family at that point would have prevented her from being able to move into the next developmental stage in a safe and healthy way. Staton further testified that the current situation was causing fear and anxiety for K.M.M. because she was faced with a real fear of losing her family, and needed permanency with her foster family. When the juvenile court asked what would be in K.M.M.'s best interests—returning to J.M. or remaining with her foster family— Staton testified that K.M.M. needed to stay with her foster family because it is "really damaging to lose a really secure attachment at the age that she is at." 1 RP at 140.

3.      Tom Sherry – Visitation Evaluator

Tom Sherry is a counselor who was retained by the Department to "give an opinion, or regarding what is in [K.M.M.'s] interest, for visitations and provide a recommendation with that as kind of a central question." 2 RP at 225-26. From Sherry's first meeting with K.M.M., K.M.M. was adamant that she did not want any contact with either of her parents. Sherry also met with J.M. Sherry opined that J.M. had trouble understanding where K.M.M. was coming from and why reunification was not the next step for K.M.M.

After meeting with the parties, Sherry recommended that any visitation be structured around K.M.M.'s visits and relationships with her younger sisters. Sherry did not believe that it was realistic that K.M.M. would want to go back to her parents. And, there did not seem like there was much of a possibility of reunification. Instead, the hope was that if K.M.M. maintained a

relationship with her sisters, the incidental contact with her parents may encourage K.M.M. to be more open and willing to interact with her parents. Sherry explained his recommendation:

> Well, with—the plan would be that—well, one, that she should have ongoing contact, that she should have interactions with her siblings on a consistent basis. But with regards to interactions with her parents, I thought a way to soften, I guess, that cut-off between her and her parents would be to have her present and around when parents, parent, or whichever parent was going to be having the visit, that she would be around when the parent came and either picked up the kids or where they met.

2 RP at 239.

Sherry also stated that family therapy for K.M.M. and her sisters may have been necessary to help the children adjust to their new roles as the younger sisters transitioned back to D.C. Sherry did not recommend reunification. And, the family therapy recommendation was related to K.M.M. maintaining her relationships with her sisters, not working toward reunification with her parents. However, family therapy and clarification sessions could not take place if K.M.M. refused to attend and be a willing participant.

Sherry recommended that K.M.M. stay in her current foster home. Sherry agreed with Staton's testimony that once a child has healed and is able to attach to some adults, it makes them more able to attach to other adults. He testified that K.M.M.'s decision to refuse to see her parents needed to be respected because it was directly tied to her sense of self. And, disregarding K.M.M.'s decision would be the equivalent of telling her that she did not matter. When asked what the impact of overriding K.M.M.'s decision and forcing her to go to J.M. would be, Sherry responded:

> Well, it would be harmful, detrimental. I am trying to think of how she would display it. I am not sure if she would internalize and withdraw because I don't know her that well. I don't know how much you go there versus it would be an external display of like acting out on some level, a combination of the two. But

I think it would be detrimental, and she would show it and experience it. So detrimental is kind of a light word. I think it would be a pretty big hit from what I understand of her.

2 RP at 272-73.

4.     K.M.M.'s Testimony

K.M.M. testified at trial. Prior to trial, the juvenile court arranged for K.M.M.'s parents to watch her testimony in a separate room because of K.M.M.'s fear and anxiety about seeing her parents. K.M.M. also had the juvenile court's comfort dog with her while she testified. During her testimony, K.M.M. referred to her foster parents as "mommy and daddy" and referred to her biological parents by their first names. 2 RP at 282.

K.M.M. testified that there was nothing adults could do that would make her want to live with her biological parents. She also testified that she missed her sisters but that she did not want to see them because they talked about D.C. and J.M. She stated that "[t]he reason why I don't want to see [J.M.] is because I don't want to have memories of him." 2 RP at 288. She also stated that when J.M. tried to hug her the last time she saw him, she felt "very scared." 2 RP at 289. K.M.M. told the juvenile court that she wanted to be adopted "very much." 2 RP at 303.

5.     Patty Pritchard – Social Worker

In the summer of 2012, Patty Pritchard was the social worker assigned to the case after Richardson. When Pritchard took over the case, K.M.M. did not have any visitation because she refused to see her parents. Pritchard prepared all parties for the "natural contacts" recommended by Sherry. Pritchard explained the guidelines of the visit to J.M., including that K.M.M. might not engage with him and that he could not overwhelm her.

Pritchard was at the last contact between K.M.M. and J.M. When the van arrived, K.M.M. hid in the back of the van and did not want to see J.M. J.M. went to the van and opened the doors. He began talking to K.M.M. and then put his hands on her. Pritchard ended the contact because "it was clearly very disturbing to [K.M.M.]." 2 RP at 329. K.M.M. was very upset about what had happened and did not want to see J.M. again.

At the next court hearing, the dependency court suspended the natural contact visits. Pritchard also talked to J.M. about the incident, but he did not appear to understand why the incident was disturbing or disruptive to K.M.M. Pritchard testified that J.M.'s parental deficiencies were his lack of understanding of K.M.M.'s needs, as well as, J.M.'s underlying mental health issues.

6. Lisa Sinnitt – Social Worker

Lisa Sinnitt was the original filing social worker, who was then reassigned as the family social worker in March 2013. When Sinnitt was reassigned to the case, the dependency court had already suspended visitation. Sinnitt reached out to both Staton and Sherry to explore the possibility of K.M.M. resuming visits with J.M. and D.C. She also talked to K.M.M. about resuming visitation, but she could not get K.M.M. to agree to resume visitation.

K.M.M. had a sibling visit scheduled in June 2013, but when the supervisor arrived to pick her up, K.M.M. refused to go. Sinnitt developed a different plan for K.M.M.'s visit in July 2013. She decided to transport K.M.M. to the visit, and the visit would take place in the community rather than in the treatment facility where K.M.M.'s sisters were living with D.C. However, when Sinnitt arrived to pick up K.M.M., she could not get K.M.M. to go with her. K.M.M.'s sibling visits stopped after July 2013 because K.M.M. refused to go. Sinnitt testified that if a child refuses

11

to attend a visit, the Department is not permitted to use physical force to make the child attend the visit. The Department is also not permitted to lie or trick children to get them to go to visitation. According to Sinnitt, the only way to get K.M.M. to go to visitation would be to physically force her, lie to her, or trick her; none of which are allowed by the Department.[6]

Sinnitt testified that J.M.'s strengths were his desire to be a parent and, with K.M., he was able to make progress repairing his relationship with her. However, with K.M.M., he continued to have a lack of insight and understanding as to her needs. Sinnitt also testified that J.M. was unable to parent K.M.M.:

> In order to parent someone, there—it is a reciprocal relationship. And at this time, we have a child who is refusing to engage in that reciprocity of that relationship. She is not engaged and not willing, and he has shown through his behavior his inability to understand where she is coming from.

3 RP at 402. Sinnitt was not aware of any services that could reestablish the relationship between K.M.M. and J.M. And there was no opportunity to repair the relationship because K.M.M. would not participate. For example, when Sinnitt asked K.M.M. if she wanted letters from J.M. and D.C., K.M.M. told Sinnitt that if she got letters she would rip them up.

Sinnitt further testified that in order to engage in family therapy, all the parties have to be willing participants. K.M.M. was not a willing participant. Other services that support a parent's interaction with the child and reunification, such as family preservation services and parent-child interactive therapy, would not have been appropriate because these services are available only when a child is living in, or being transitioned to, the parent's home. When asked whether there

---

[6] Sinnitt also arranged J.M.'s supervised visitation with K.M. From late June or early July of 2013 through August 2013, J.M. had extended visits with K.M., including overnight visits. However, the visits were supervised by J.M.'s significant other. In September, the month before the termination trial, J.M. began having unsupervised visits with K.M.

was an earlier time when the relationship could have been repaired, Sinnitt responded that she could not identify a specific time when that would have been possible.

    7.    Jennifer Martin – Guardian ad Litem (GAL)

Jennifer Martin is the assigned GAL for K.M.M. Martin reported that K.M.M. had repeatedly questioned why people were not listening to her. Martin testified that family therapy was never an option in this case because J.M. and K.M.M. did not progress beyond the peripheral or incidental contact originally recommended by Sherry.

Sometime in 2011, K.M.M. stated that she "just want[s] it over." 4 RP at 667. Martin believed that after K.M.M. made the statement, the visitation staff talked to Martin and the matter may then have been referred to Staton.

The juvenile court questioned whether K.M.M.'s comment demonstrated a "tentative moment" where K.M.M. was starting to disengage. 4 RP at 669. And, the juvenile court asked Martin if it would have been appropriate to attempt reunification or family therapy. Martin responded that she did not know. There was no recommendation that family therapy would have been appropriate, and J.M. was already engaged in hands-on parenting at that time. Martin also testified that neither parent was in a position to participate in family therapy in 2011, when K.M.M. first refused to visit her parents.

The juvenile court also asked Martin why K.M.M. reacted to her parents with fear. Martin stated that it was likely K.M.M. reacted with fear because of the constant threat of being taken away from the people she now considered her family. Martin had talked to K.M.M. about the progress her parents were making and that they are trying to be good parents. According to Martin,

K.M.M. would listen to Martin and acknowledge what she is saying, but ultimately, Martin did not think it mattered to K.M.M.

E.     TRIAL COURT FINDINGS

After the fact-finding hearing, the juvenile court entered extensive findings of fact, including:

IX.

All services reasonably available, capable of correcting the parental deficiencies within the foreseeable future, have been offered or provided to the father with the exception of reunification services which if provided are no longer capable of providing a solution. The father has remedied his own parental deficiencies identified by the State['s] . . . petition.

X.

The father's testimony was credible. The father's parental deficiencies have been corrected. The father never posed an abuse risk to [K.M.M.]. The issues the father may have with PTSD or anger are not deficiencies that prevented him from parenting [K.M.M.]. The father was willing to enter into, to attend, make progress in, and complete all the services that were offered to him by the state. The absence of a parent/child relationship today between the father and [K.M.M.] is not due to a parental deficiency but due to the absence of the relationship, which cannot now be corrected without great harm being caused to [K.M.M.].

. . . .

XII.

It is not due to parental deficiencies that [K.M.M.]'s psyche got to the point where she would no longer tolerate or engage with visits with her biological parents. Through no fault of the father, [K.M.M.] had taken the strong position that she did not want to engage in visitation. In 2011, the relationship between [K.M.M.] and her father was at a critical juncture and the provision of reunification therapy at that time may have prevented her from extinguishing her attachment to her father.

XIII.

As a result of [K.M.M.]'s refusal to attend visitation with her parents, the court ordered Tom Sherry to perform an evaluation on the issue of reunification

therapy. Tom Sherry concluded that there is no probability that reunification therapy could remedy the now severed parent[-]child bond, the attachment bond, between [K.M.M.] and [J.M.]. Everyone has agreed and testified that there is no reasonable probability that reunification therapy, or any other kind of therapy, can remedy this situation within the foreseeable future. Thus, all services reasonably available, capable of reuniting [K.M.M.] with her father within the foreseeable future, have been offered or provided in this case. The absence of any bond between [K.M.M.] and her father cannot now be corrected.

### XIV.

There is no likelihood that conditions will be remedied so that [K.M.M.] could be returned to the father in the near future. The parent[-] child relationship, the attachment bond, no longer exists between these two individuals. There is no service that is capable of correcting this now severed parent[-]child relationship, this severed attachment bond between [K.M.M.] and [J.M.].

The lack of the attachment bond is not due to any of [J.M.]'s parental deficits. [J.M.]'s parental deficits have been corrected. The father has successfully participated in the court ordered rehabilitative services and has remedied these individual parental deficits. He has fully complied with substance abuse, domestic violence, and hands on parenting services.

No one had contemplated that the father would be the primary parent for [K.M.M.]. He is not now the primary parent for his other daughter. K.M., along with her half-sibling, K.C., has been returned to the care of the mother for more than a year now, and [J.M.] is an appropriate parent to [K.M.].

### XV.

The attachment bond, the parent-child relationship that no longer exists between [K.M.M.] and [J.M.], cannot now be repaired. To attempt reunification therapy would be detrimental to [K.M.M.], causing great harm to her, according to Tom Sherry and Cory Staton, two experienced therapists. [K.M.M.] would suffer emotional derailment of her progress, and any such attempt would likely compromise her ability to begin to establish the other social and emotional stages she needs to go through, such as developing an ability for empathy. [K.M.M.] herself has taken the strong position that she will not engage with her parents during visits and does not want to be part of that family.

CP at 107-09. The juvenile court also found that termination of J.M.'s parental rights was in

K.M.M.'s best interests.

Based on its findings of fact, the juvenile court concluded that the Department had proved all six statutory factors in RCW 13.34.080(1)(a) through (f) by clear, cogent and convincing evidence. And, "[b]ecause the attachment bond no longer exists between [K.M.M.] and her father, [J.M.] is currently unable to parent [K.M.M.]." CP at 112. The juvenile court entered an order terminating J.M.'s parental rights as to K.M.M. J.M. appeals.

ANALYSIS

We review an order terminating parental rights to determine whether the juvenile court's findings of fact are supported by substantial evidence from which the trier of fact can find the necessary facts by clear, cogent and convincing evidence. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). Clear, cogent, and convincing evidence exists when the ultimate fact at issue is "highly probable." *Id.* "Substantial evidence is evidence sufficient to persuade a fair-minded rational person of the truth of the declared premise." *In re Welfare of C.B.*, 134 Wn. App. 942, 953, 143 P.3d 846 (2006) (citing *Bering v. Share*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986), *cert. dismissed*, 479 U.S. 1050 (1987)). We defer to the fact finder on issues of witness credibility and the persuasiveness of the evidence. *K.S.C.*, 137 Wn.2d at 925; *In re Dependency of A.V.D.*, 62 Wn. App. 562, 568, 815 P.2d 277 (1991). Also, the juvenile court has the advantage of having the witnesses before it, and therefore, we accord deference to the juvenile court's decision. *In re Welfare of Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). We review whether the juvenile court's findings support its conclusions of law. *In re Dependency of Schermer*, 161 Wn.2d 927, 940, 169 P.3d 452 (2007).

The juvenile court may order termination of parental rights if the Department establishes the six elements in RCW 13.34.180(1)(a) through (f) by clear, cogent, and convincing evidence. RCW 13.34.180(1) states:

A petition seeking termination of a parent and child relationship may be filed in juvenile court by any party, including the supervising agency, to the dependency proceedings concerning that child. Such petition shall conform to the requirements of RCW 13.34.040, shall be served upon the parties as provided in RCW 13.34.070(8), and shall allege all of the following unless subsection (3) or (4) of this section applies:

    (a)    That the child has been found to be a dependent child;

    (b)    That the court has entered a dispositional order pursuant to RCW 13.34.130;

    (c)    That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a findings of dependency;

    (d)    That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

    (e)    That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .

    . . . .

    (f)    That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

The Department must also prove by a preponderance of the evidence that termination of parental rights is in the child's best interests. RCW 13.34.190(1)(b).

## A.    NECESSARY SERVICES

J.M. argues that the Department failed to prove that all necessary services, reasonably available, and capable of correcting parental deficiencies within the foreseeable future, have been expressly and understandably offered or provided as required by RCW 13.34.180(1)(d). J.M. asserts that the Department failed to provide (1) reunification services, (2) the same services that were offered to the foster parents, and (3) regular visitation with K.M.M. We disagree.

In a dependency proceeding, the Department must provide all necessary services, reasonably available, capable of remedying parental deficiencies, as well as conditions preventing reunification. RCW 13.34.180(1)(d); *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010). However, "[w]here the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services." *In re Welfare of M.R.H.*, 145 Wn. App. 10, 25, 188 P.3d 510 (citing *In re Welfare of Ferguson*, 32 Wn. App. 865, 869-70, 650 P.2d 1118 (1982), *rev'd on other grounds*, 98 Wn.2d 589, 656 P.2d 503 (1983)), *review denied* 165 Wn.2d 1009 (2008) and *cert. denied*, 556 U.S. 1158 (2009). Even when the Department "inexcusably fails" to offer or provide necessary services, "termination is appropriate if the service would not have remedied the parent's deficiencies in the foreseeable future." *In re Dependency of T.R.*, 108 Wn. App. 149, 164, 29 P.3d 1275 (2001); *see also In re Welfare of Hall*, 99 Wn.2d 842, 850-51, 664 P.2d 1245 (1983).

1. Reunification Services[7]

J.M. argues that the Department failed to prove that all necessary services were offered or provided because the Department failed to provide J.M. with reunification services. J.M.'s argument is largely based on two of the juvenile court's findings that are not supported by substantial evidence (1) the Department failed to provide reunification services at a critical juncture and (2) the dependency court ordered family therapy. Because these findings are not supported by substantial evidence, they cannot form a basis for reversing the juvenile court's conclusion that the Department met its burden to prove that all necessary services were expressly

---

[7] For clarity, "reunification services" will refer to all services that J.M. referenced at trial—parent and child interactive therapy, family preservation services, reconciliation therapy, and family therapy.

or understandably offered or provided. However, based on the facts that are supported by substantial evidence, we hold that the Department met its burden to prove that all services reasonably available and capable of correcting the parental deficiencies were expressly and understandably offered and provided.

J.M. asserts that, if the Department fails to offer services at the time that the services could have remedied the identified parental deficiencies, the juvenile court may not terminate parental rights. In other words, offering the services must be futile at the time the services could have remedied the parenting deficiencies. Based on this assertion, J.M. argues that the juvenile court erred by terminating his parental rights because the Department failed to offer reunification services at the "critical juncture" in 2011, when reunification services would have prevented the breakdown in K.M.M.'s relationship with J.M. 4 RP at 722; CP at 108. Even assuming that J.M.'s characterization of the futility doctrine is correct, his argument fails.[8]

J.M.'s argument depends on the juvenile court's findings that in 2011, "the relationship between [K.M.M.] and [J.M.] was at a critical juncture and the provision of reunification therapy at that time may have prevented her from extinguishing her attachment to [J.M.]." CP at 108.

---

[8] J.M. ignores the application of the futility doctrine in cases such as *Hall*, 99 Wn.2d at 851, and *T.R.*, 108 Wn. App. at 164. In both *Hall* and *T.R.* the courts held that services were futile because the services would not remedy the identified parental deficiencies in the foreseeable future. Therefore, the futility doctrine allows the juvenile court to terminate parental rights if either (1) the services would have been futile when offered or (2) offering the services would not remedy the parental deficiencies within the foreseeable future for the child. *See Hall*, 99 Wn.2d at 851 (providing parenting skills training would be futile because it would not remedy parenting deficiencies in the child's foreseeable future); *In re Dependency of Ramquist*, 52 Wn. App. 854, 861, 765 P.2d 30 (1988) ("[A] parent's unwillingness or inability to make use of the services provided excuses the State from offering extra services that might have been helpful."), *review denied*, 112 Wn.2d 1006 (1989).

However, this finding of fact is not supported by substantial evidence.[9] Here, the only indication that there was a time in 2011 that could be potentially considered "critical" was Martin's testimony that, in 2011, K.M.M. made a single statement that she wanted the case to be over with. 4 RP at 667. However, Martin's testimony does not support the finding that this time was a "critical juncture" as it relates to K.M.M.'s relationship with her father.

First, although the statement could indicate that K.M.M. wanted to be adopted by her foster family, it is equally likely that, at the time, she wanted to go home. Depending on when the statement was made, K.M.M. continued visiting with her parents for anywhere from several months to over a year after she made the statement. Nothing in the record supports the finding that there was a point in 2011, during which K.M.M.'s relationship with her father had reached a "critical juncture."

Second, the juvenile court specifically asked Martin if providing reunification services or family therapy at the time K.M.M. made the statement would have prevented the situation from deteriorating. Martin testified that she could not definitively say one way or the other, but she could testify that at the time K.M.M. made the statement, providing reunification services was not possible.

Thus, even if 2011 was a "critical juncture" for the relationship between K.M.M. and J.M., which there is no evidence to support, reunification services could not have prevented her from extinguishing her relationship with her father because J.M. was not in a position to participate in reunification services at that time and reunification services were not available. Accordingly, the juvenile court's finding that "[i]n 2011, the relationship between [K.M.M.] and her father was at a

---

[9] J.M. specifically assigns error to the juvenile court's finding.

critical juncture and the provision of reunification therapy at that time may have prevented her from extinguishing her attachment to her father" is not supported by substantial evidence. CP at 108 (Finding of Fact XII).

Based on the evidence before the juvenile court, the Department was not aware that the relationship between K.M.M. and J.M. was a barrier to reunification until K.M.M. began refusing visits in 2012. At that point, attempting to provide reunification services would have been futile. All the service providers testified that reunification services were not available to the family when K.M.M. began refusing to attend visits. Reunification services require that the child is transitioned or being transitioned into the home, which was not the case here. And, reunification services also require the willing participation of the participants, and K.M.M. was not willing to participate. Therefore, even if the Department had referred K.M.M. and J.M. to reunification services when K.M.M. began resisting and refusing visitation, the referral would have been futile because the services were not available and K.M.M. would not have participated.

J.M. relies on *In re Termination of S.J.*, 162 Wn. App. 873, 256 P.3d 470 (2011). But, *S.J.* is distinguishable from this case. In *S.J.*, the Department had identified the problem in the relationship between the mother and child but had declined to offer any additional services to address the issue. *Id.* at 877-78. The appellate court reversed the order terminating the mother's parental rights because the Department had identified a major issue preventing reunification but chose to do nothing about it. *Id.* at 883. The court held that it is the Department's, not the parent's, burden to ensure proper services are being provided. *Id.* at 883-84. Here, the Department began taking action to address the problems between K.M.M. and J.M. when they became aware of the issue in 2012. And, the Department attempted to identify the appropriate services by obtaining

21

the evaluation with Sherry. Therefore, the grounds that necessitated reversal in *S.J.* are not present here.

J.M. also argues that the Department failed to provide court ordered services because the dependency court ordered the Department to provide reunification services and the Department failed to do so. J.M. relies on the December 26, 2012 dependency review order that states: "The father will participate in family therapy with Thomas Sherry with Clear Creek Psychological Associates to address issues with visitation." CP at 334 (Ex. 14). The Department argues that this provision refers to participation in the evaluation with Sherry. This is reasonable considering that Sherry never recommended that J.M. engage in family therapy with K.M.M.

Moreover, in August 2013, the dependency court expressly refused to order the Department to offer or provide family therapy. And, when the dependency court explicitly denied J.M.'s request for reunification services, the services were no longer court ordered for the purposes of the Department proving RCW 13.34.180(1)(d). *See* RCW 13.34.180(1)(d) (requiring the Department to prove that all "services ordered under RCW 13.34.136" were offered or provided *and* that all necessary services were offered and provided). Thus, J.M.'s claim that the Department did not prove that all necessary services were offered or provided because reunification services were not provided fails.

2.    Services Provided Only To Foster Parents

J.M. argues that the Department failed to prove that all necessary services were offered or provided because K.M.M.'s foster parents received services that he did not. Specifically, J.M. argues that the foster parents were provided with "attachment and bonding services" while J.M. was not. Br. of Appellant at 17. But the foster parents were not provided with attachment and

bonding services—they necessarily participated in K.M.M.'s therapy because they were her caregivers. Therefore, we hold that there was no service provided to the foster parents that the Department subsequently failed to offer or provide to J.M.

J.M. relies on *In re Welfare of C.S.*, 168 Wn.2d 51, to assert that the juvenile court may not order termination of parental rights if the parent has not been provided with every service provided to the foster parents. But, J.M.'s assertion is incorrect. In *C.S.*, the foster mother received training for handling the child's behavioral issues but the mother did not receive the same training. *Id.* at 55-56. The juvenile court terminated the mother's rights because of her inability to effectively manage the child's behavioral issues. *Id.* at 55. Our Supreme Court did not reverse the order terminating the mother's rights because the foster mother received a service she did not; the court reversed the order because the training was a necessary service the Department failed to offer or provide. *Id.* at 56. Under *C.S.* the relevant inquiry is still whether the Department offered or provided all necessary services.

As to K.M.M.'s therapy, there was no service that could have been provided to J.M. K.M.M.'s individual therapy was just that—an individual service provided to the child. To the extent that participation in K.M.M.'s therapy can be characterized as "attachment and bonding services," that is addressed above regarding reunification services. Br. of Appellant at 17. Otherwise, the fact that J.M. did not participate in K.M.M.'s therapy is not relevant to determining whether the Department met its burden to prove that all necessary services were offered or provided because participation in a child's individual therapy is not a service for the parent. Thus, J.M.'s claim that the Department did not prove that all necessary services were offered or provided because K.M.M.'s foster parents received services that he did not fails.

23

3. Visitation

Finally, J.M. alleges that the Department failed to provide him with a necessary service because he was not provided with regular visitation. J.M.'s argument regarding visitation fails for three reasons: (1) visitation is not a service that the Department is required to provide, (2) the dependency court suspended visits because of the harm to K.M.M., and (3) ordering continued visitation would have been futile and harmful to K.M.M.

a. Visitation is not a service

Washington courts have held that visitation is not a service for the purposes of proving RCW 13.34.180(1)(d). *In re Dependency of T.H.*, 139 Wn. App. 784, 791-92, 162 P.3d 1141, *review denied*, 162 Wn.2d 1001 (2007). J.M. acknowledges that, under the current law, visitation is not a service that the Department is required to provide to meet its burden under RCW 13.34.180(1)(d). However, J.M. argues that because of the amendments to federal law, we should overturn the holding in *T.H.* and hold that visitation is a service. We decline to do so.

Under federal law, time-limited family reunification services include "[s]ervices and activities designed to facilitate access to and visitation of children by parents and siblings." 42 U.S.C. § 629a(a)(7)(B)(vii). RCW 13.34.025(2)(a) adopts the definition of time-limited family reunification services from 42 U.S.C. § 629a. Therefore, J.M. argues, if visitation is a service under the federal definition of time-limited family reunification service, visitation is a service for the purpose of RCW 13.34.180(1)(d). But, under the plain language of 42 U.S.C. § 629a(a)(7)(B)(vii), visitation is not a service under the definition of time-limited family reunification services.

Whether 42 U.S.C. § 629a(a)(7)(B)(vii) includes visitation in the definition of time-limited family reunification services is a question of statutory interpretation. We review issues of statutory interpretation de novo. *In re Interest of J.R.*, 156 Wn. App. 9, 15, 230 P.3d 1087, *review denied*, 170 Wn.2d 1006 (2010). The purpose of statutory interpretation is to determine and give effect to the legislature's intent. *Id.*

We begin with examining the plain language of the statute. *State v. K.L.B.*, 180 Wn.2d 735, 739, 328 P.3d 886 (2014). "If the statute is unambiguous, meaning it is subject to only one reasonable interpretation, our inquiry ends." *Id.* We determine the plain language of the statute from the ordinary meaning of the language, the general context of the statute, the related provisions, and the statutory scheme as a whole. *State v. Bays*, 90 Wn. App. 731, 735, 954 P.2d 301 (1998). We give effect to all the language in the statute and do not render any portion meaningless or superfluous. *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003). We avoid interpretations that produce absurd results because we presume that the legislature did not intend an absurd result. *Id.*

The plain language of 42 U.S.C. § 629a(a)(7)(B)(vii) states that time-limited family reunification services include "[s]ervices and activities designed to facilitate access to and visitation of children by parents and siblings." If "service" means "visitation" then the statute would require visitation designed to facilitate visitation. Interpreting the word "services" to mean visitation renders the remaining language in the statute superfluous because if visitation was a service, services would not be required to facilitate visitation.

We presume that the legislative body "'means exactly what it says.'" *State v. Delgado*, 148 Wn.2d 723, 727, 63 P.3d 792 (2003) (quoting *Davis v. Dep't of Licensing*, 137 Wn.2d 957,

25

964, 977 P.2d 554 (1999)). The legislative body did not say that time-limited family reunification services includes visitation; it said services must facilitate visitation. Thus, we assume that the legislative body meant services to facilitate visitation, not that services is visitation.

Under the plain language of 42 U.S.C. § 629a(a)(7)(B)(vii), visitation is not a time-limited family reunification service. Therefore, the amendments to federal law do not require us to reverse the decision in *T.H.* Visitation is not a service for the purpose of determining whether the Department met its burden to prove that all necessary services, reasonably available, capable of remedying parental deficiencies were expressly and understandably offered or provided under RCW 13.34.180(1)(d).

### b. Visitation suspended

Furthermore, even if we determined that visitation could be considered a service, the Department did not fail to provide visitation because the dependency court suspended visitation based on the harm to K.M.M. J.M. argues that the Department improperly failed to provide visitation because "[v]isitation during dependency is not just a service but a right." Br. of Appellant at 19. J.M. supports this assertion by citing to RCW 13.34.136(2)(b)(ii). But RCW 13.34.136(2)(b)(ii) does not create an inviolable right as J.M. seems to suggest.

Under RCW 13.34.136(2)(b)(ii)(A) visitation is only the right of the family "in cases in which visitation is in the best interests of the child." The statute provides that "[v]isitation may be limited or denied only if the court determines that such limitation or denial is necessary to protect the child's health, safety, or welfare." RCW 13.34.136(2)(b)(ii)(C). And, the statute prohibits limiting visitation as a sanction for failure to comply with court orders or services. RCW 13.34.136(2)(b)(ii)(B). Therefore, J.M. has a right to visitation if (1) visitation is in K.M.M.'s best

interests, (2) visitation is not a risk to K.M.M.'s health, safety, or welfare, and (3) any limitation on visitation is not a sanction for failure to comply with court orders or services. In this case, J.M. had no "right" to visitation under RCW 13.34.136(2)(b)(ii)(A).

In December 2012, the dependency court suspended J.M.'s visitation with K.M.M. based on its finding that visitation posed a risk to K.M.M.'s welfare. The court's decision came after the first incidental/natural contact visit with K.M.M. in which J.M. disregarded the guidelines for the contact and physically touched K.M.M. while she was hiding in the back of the transportation van. Because the dependency court found that visitation was a risk to K.M.M.'s welfare, it could suspend visitation under RCW 13.34.136(2)(b)(ii). When the dependency court suspended visitation, J.M. had no right to visitation and the Department was not required to provide visitation. Even if visitation is considered a service for the purposes of RCW 13.34.180(1)(d), the Department did not fail to offer or provide visitation after the dependency court suspended visitation.

c. Visitation futile

Finally, even if we consider visitation to be a service and the dependency court reinstated the visitation, visitation would have been futile. It is undisputed that after the failed incidental/natural contact visitation between K.M.M. and J.M., K.M.M. refused to have any contact with her parents. Sinnitt testified that in order to get K.M.M. to visitation with her parents, the Department would have had to use physical force, lie to K.M.M., or trick K.M.M. And, Sinnitt testified that the Department is not permitted to do any of those things to compel a child to attend visitation. Therefore, while the Department could have asked the dependency court to reinstate visitation, and assuming the dependency court agreed, it would not have mattered because the

Department could not make K.M.M. actually attend or participate in the visitation. Accordingly, reinstating visitation would have been futile.

B.    CURRENT UNFITNESS

Due process requires that a parent be currently unfit in order for the juvenile court to terminate his or her parental rights. *In re Welfare of A.B. (A.B. I)*, 168 Wn.2d 908, 920, 232 P.3d 1104 (2010). When the juvenile court expressly makes such a finding, the parent's due process right is not at issue. *Id.* at 921.

J.M. argues that the juvenile court violated his right to due process by terminating his parental rights without making a finding that he was currently unfit to parent. J.M. contends that this case is indistinguishable from *A.B.* I, 168 Wn.2d 908. Specifically, J.M. contends that the juvenile court failed to make an express finding of unfitness and the record before this court does not support an implied finding of unfitness because the juvenile court found he was a fit parent. Here, by finding that J.M. was unable to parent K.M.M., the juvenile court made an express finding of unfitness. Accordingly, we hold that the juvenile court did not violate J.M.'s right to due process by terminating his parental rights without finding that he was currently unfit.

In its order, the juvenile court expressly found that "the attachment bond no longer exists between [K.M.M.] and her father [J.M.] is currently unable to parent [K.M.M.]." CP at 112. Thus, whether the juvenile court made an express finding of unfitness depends on whether "currently unable to parent" is the equivalent of currently unfit. In *In re Welfare of A.B. (A.B. II)*, 181 Wn.

App. 45, 323 P.3d 1062 (2014), we applied a definition of current unfitness which provides helpful guidance here. We explained:

> To meet its burden to prove current unfitness in a termination proceeding, DSHS is required to prove that the parent's parenting deficiencies prevent the parent from providing the child with "basic nurture, health, or safety" by clear, cogent, and convincing evidence. *See* RCW 13.34.020; *see also generally* former RCW 13.34.180(1)(e)(ii) (parent has a condition that "render[s] the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child").

*Id.* at 61. We went on to cite the definitions of unfitness previously articulated by our Supreme Court in *In re Custody of B.M.H.*, 179 Wn.2d 224, 236, 315 P.3d 470 (2013) ("A parent is unfit if he or she cannot meet a child's basic needs"), and *Aschauer*, 93 Wn.2d at 694 ("[the mother] lacks the necessary capacity for giving parental care"). *A.B.* II, 181 Wn. App. at 61 n.2.

Throughout the analysis in *A.B.* II, we noted that the Department failed to prove the mother was unfit because it failed to prove that her parenting deficiencies rendered her unable to care for her child. For example, we held that there was not sufficient evidence to allow the juvenile court to find that the mother was "unable to perceive the dangers that [domestic violence] poses to her child," or that the mother was "unable to effectively communicate with [the child]." *A.B.* II, 181 Wn. App. at 63. Finally, we stated that the Department did not prove that the mother was unfit because "it is not highly probable . . . that [the mother] would be unable to provide for his basic needs." *Id.* at 64.

*A.B.* II demonstrates that the definition of current unfitness encompasses many words and expressions, including "prevent," "cannot," "lack," and "unable." *Id.* at 62-63. As the analysis in *A.B.* II demonstrates, the Department must prove that a parent is unable to provide for the basic

needs of the child in order to prove that the parent is currently unfit. *Id.* at 63. Therefore, it follows that if the parent is unable to parent, the parent is unfit.

Here, the juvenile court found that J.M. is unable to parent K.M.M. There is a complete lack of relationship between K.M.M. and J.M. The condition is more than K.M.M. simply refusing to see J.M. K.M.M. suffers from fear when forced to engage with J.M. Staton and Sherry testified that K.M.M.'s identity is tied to her foster family, and severing her from her foster family will cause harm to her and prevent her normal development. And, Sherry testified that overriding K.M.M.'s decision will damage her sense of self and be very detrimental to her. The witnesses agreed that reunification is not an option at this point and there are no services that can repair the relationship between K.M.M. and J.M. such that J.M. would be able to parent K.M.M. At the time of the termination trial, there existed a condition preventing reunification that was not likely to be remedied in the foreseeable future. *See* RCW 13.34.180(1)(e).

The juvenile court's finding that J.M. is unable to parent K.M.M. is qualitatively the same as a finding that J.M. is currently unfit to parent K.M.M. Therefore, we conclude that the juvenile court expressly found that J.M. was currently unfit. Accordingly, the juvenile court's order terminating J.M.'s parental rights did not violate J.M.'s right to due process by failing to find that J.M. is currently unfit.

## CONCLUSION

The Department met its burden to prove that all necessary services were expressly and understandably offered or provided. And, the juvenile court complied with due process

30

No. 45809-8-II

requirements by expressly finding that J.M. was currently unfit to parent K.M.M. Accordingly, we affirm the juvenile court's order terminating J.M.'s parental rights.

_____
Lee, J.

We concur:

_____
Johanson, C.J.

_____
Maxa, J.

31