**FILED**
**NOV 19, 2015**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Welfare of: | ) | |
| | ) | No. 32938-1-III |
| R.L., | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

KORSMO, J. — A father, JL, appeals the trial court's decision to terminate his parental rights to his son, RL. We affirm.

## FACTS

RL, his older brother, and his step-sister, were placed with their maternal great-grandparents after their mother, AL, was accused of domestic violence against JL in May, 2010. Because of this incident, the Department of Social and Health Services (DSHS) initiated dependency proceedings. JL was permitted to visit the children.

The dependency required JL to complete certain services, including a neuro-psychological evaluation, individual mental health therapy, parenting class, domestic violence perpetrator evaluation, drug and alcohol evaluation, and UA/BA monitoring. He immediately began the required services. After an evaluation, JL also began a one year domestic violence treatment program in August 2010.

Dr. Brian Campbell conducted a neuropsychological evaluation. He found that, while JL had above average intelligence, he had lower scores in memory and may have trouble learning. Dr. Campbell noted that because JL's own childhood was abusive, he began using alcohol and abusing drugs at a young age. Ultimately Dr. Campbell diagnosed JL with a cognitive disorder, mild anxiety, and memory loss associated with a past traumatic brain injury. He recommended a variety of services including but not limited to continuing domestic violence/anger management education, cognitive behavior therapy, relaxation training, and stress reduction. DSHS attempted to work with JL's primary care physician to arrange these services.

In March 2011, DSHS attempted to move the children back into JL's house, but two months later another domestic violence incident occurred. Assisted by DSHS, AL sought and obtained a protection order against JL for herself and the children. DSHS also struck its motion to return the children to their home. At this point, JL left Colville and went to visit his grandmother in Nevada; DSHS was unable to reach him. Because he left town, JL's visits were suspended and he did not complete his one-year domestic violence perpetrator treatment program. In August 2011, the program discharged him for missing the last three sessions.

By May 2012, JL was back in Washington. That spring, he spent some time incarcerated in Spokane. In July 2012, JL entered a 30-day inpatient chemical dependency treatment program. After completing the inpatient program, it was

2

recommended he complete an outpatient program as well.[1] That October, DSHS referred JL to Sean Smithram, a clinical psychologist. JL only attended two sessions. He missed three sessions in November and another three sessions in December.

JL was again incarcerated from February until early April 2013. DSHS served him with notice of the termination proceeding during this time. Although the petition mentioned both of JL's sons, by the time of trial DSHS was pursuing termination only as to the youngest child, RL. AL relinquished her parental rights and is not a party to this appeal.

Shortly after JL was released from jail, there was a family team decision meeting regarding the children. RL's therapist recommended against any contact with his father. JL then stopped communicating with DSHS. He had no contact with the agency until July 10, 2013, when he notified the social worker that if he could not see his children he was not going to be engaging in any more services.

The termination trial began in early May 2014. A number of witnesses testified, including RL's therapist. She had begun seeing RL two years earlier when the child was four. The therapist indicated that RL suffers from post-traumatic stress disorder (PTSD). He has "rage episodes," suffers from emotional distress, and is very hard on himself. RL told the therapist his dad was scary. She testified that rage would be triggered when RL

---

[1] Our record does not indicate whether he did so.

3

went out in public or saw men with tattoos because they reminded him of his father. She believed that memories of violence caused his behavior.

She went on to testify that RL needs permanency. She felt that if he were adopted, he would probably need six more months of regular therapy with only sporadic therapy after that. In contrast, she could not fathom what would be required if he were not adopted, stating that he would likely need therapy until he achieves permanency. Ultimately, she did recommend that JL not have any further contact with RL.

JL testified that he was happy with his new girlfriend and their new baby. JL conceded, after listening to RL's therapist, that the situation with RL had deteriorated, and that it was best for RL to remain where he was. JL maintained, however, that he did not want his rights terminated, but instead wanted visitation once RL could handle it.

JL's current therapist, Myriah Pazerckas Roy, also testified. She ended treatment of a number of his past conditions, including PTSD and his personality disorder, because the symptoms had abated. She also said that he was doing well with his new family and there were no indications he was unfit to parent.

The trial court terminated JL's parental rights to RL. In its oral ruling, the trial court noted that although JL "has addressed many of the deficiencies, he cannot address, or doesn't have the tools to address the severe past emotional trauma that [RL] endured."[2]

---

[2] The court also stated it did not want any undue scrutiny from DSHS concerning JL's new child.

4

In its written order, the trial court specifically found that JL was currently unfit to parent RL. The court also found that RL suffered "intense trauma" while residing with JL and that he was "damaged by his relationship with his father."

JL timely appealed to this court.

## ANALYSIS

JL presents four arguments: (1) the trial court erred when it found that all reasonably necessary services had been provided to rectify his parental deficiencies, (2) the trial court erred in finding that JL was an unfit parent, (3) the trial court erred by failing to consider the incarcerated parent factors in RCW 13.34.180(1)(f), and (4) his due process rights were violated because the State did not allege the incarcerated parent factors in its termination petition. We address each argument in turn, but jointly consider the final two arguments.

When deciding whether to terminate a parent's rights to his or her child, Washington courts apply a two-step process. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). "The first step focuses on the adequacy of the parents" and requires DSHS to prove, by clear, cogent, and convincing evidence, the six termination factors set forth in RCW 13.34.180(1). *Id.* For the second step, "the trial court must find by a preponderance of the evidence that termination is in the best interests of the child." *In re M.R.H.*, 145 Wn. App. 10, 24, 188 P.3d 510 (2008) (citing RCW 13.34.190(2)). Only if the first step is satisfied may the court reach the second step. *A.B.*, 168 Wn.2d at 911.

5

*Reasonably Necessary Services*

JL only challenges the court's ruling on one of the six termination factors, arguing that the record does not support a finding under RCW 13.34.180(1)(d). That provision requires:

> That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and *all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future* have been expressly and understandably offered or provided.

(Emphasis added.) A service is "necessary" if it is needed to address a condition that precludes reunification of the parent and child. *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010). The services must be tailored to the individual's needs. *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). However, because RCW 13.34.180(1)(d) limits the services required to those capable of remedying parental deficiencies in the "foreseeable future," a trial court can find that DSHS offered all reasonable services where "the record establishes that the offer of services would be futile." *M.R.H.*, 145 Wn. App. at 25.

The finding on any factor "must be upheld if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." *Id.* at 24. "Because the trial court has the opportunity to hear the testimony and observe the witnesses, its decision is entitled to deference." *In re Welfare of S.J.*, 162 Wn. App. 873, 881, 256 P.3d 470 (2011).

6

Here, the trial court found that "[t]here is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." This is essentially a finding that further services would be futile. Substantial evidence supports this finding.

First, because JL damaged his relationship with RL so severely, reunification would be impossible, regardless of what services DSHS provides. Where it is not possible to reunify parent and child, providing further services is futile. *See In re Welfare of K.M.M.*, 187 Wn. App. 545, 568-569, 575, 349 P.3d 929 (2015). RL's counselor testified that the child was significantly scared of the very prospect of returning to his father. The fear of his father was causing him to rage and destroy things in his foster home. Setting foot outside, or any change in his routine would trigger this fear. Further, men with tattoos also triggered the fear because they reminded him of his father. The counselor continued, that while at least six months of counseling would be required if RL were adopted by his foster parents, she could not fathom what would be required if he were kept in limbo for longer. Finally, JL himself testified that he would be unable to repair his relationship with RL.

Second, JL did not complete many of the services that DSHS provided him and said he would not complete further services if DSHS continued to forbid visitation. When a parent is unwilling or unable to make use of the services provided, DSHS is not required to offer still other services that might be helpful. *T.R.*, 108 Wn. App. at 163.

7

The evidence showed that DSHS arranged for domestic violence perpetrator treatment in August 2010, which JL failed to complete. DSHS also arranged psychotherapy where JL attended only two sessions. Further, JL was simply unreachable for much of the dependency.

JL argues that if family therapy had been provided, RL would not have the current fear toward his father. JL relies heavily on our opinion in *In re S.J.* to argue that where attachment and bonding issues have arisen *because of the dependency*, DSHS has a duty to provide services to correct that issue prior to termination. *See S.J.*, 162 Wn. App. at 883-884.

JL's situation, however, is distinct from the situation in *S.J.* There the State acknowledged a lack of attachment and bonding was preventing the parent (T.H.) from effectively caring for the child (S.J.). *Id.* at 882, 883. T.H. encountered unusually strong controlling and aggressive behavior from S.J. *Id.* at 883. Further, this behavior arose because S.J. had bonded with his foster parents while away from T.H. *Id.* We noted that the child and parent were attached at the initiation of the dependency, and held that it was "DSHS's role to work with S.J. to reduce this [new] behavior." *Id.* However, it was clear in *S.J.* that the new behavior had not developed *as a fault of the parent*, but rather because of the separation itself during the dependency. *Id.* at 883-884. In comparison, here, the trial court found that RL was "damaged by his relationship *with his father*,"

8

and not by the mere separation alone. The court also noted that RL suffered "intense trauma . . . while residing with J.L."

To counter this argument, JL assigns error to these findings. Substantial evidence, however, supports them. Prior to the dependency, there was an alleged incident of domestic violence and AL was arrested. Ultimately, the department removed the children. However, JL was allowed visitation for the first year of the dependency. After the first year, there was a new incident of domestic violence and a no contact order against JL. Because of this incident and the no contact order, the court terminated JL's visitation. In addition, RL's counselor testified that RL's fear of his father, or anyone looking like his father, developed because of domestic violence that RL had seen in the home. These facts support the trial court's finding that JL caused RL's emotional trauma.

Substantial evidence supports the trial court's finding that DSHS provided all reasonably necessary services capable of correcting the parental deficiencies.

*Finding of Unfitness*

As noted previously, the first part of the termination inquiry focuses on the deficiencies of the parent and the second part focuses on the best interests of the child. In addition to the six termination factors of RCW 13.34.180(1), due process requires the trial court to explicitly or implicitly find by clear, cogent, and convincing evidence that the parent is currently unfit. *A.B.*, 168 Wn.2d at 918-919. Where a trial court finds all six elements of the statute by clear, cogent, and convincing evidence, it implicitly finds

9

the parent is unfit by the same standard. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 576-577, 257 P.3d 522 (2011). A trial court cannot terminate a parent's rights absent this finding of unfitness. *A.B.*, 168 Wn.2d at 918. We review the finding for substantial evidence. *In re Welfare of B.P.*, 188 Wn. App. 113, 132, 353 P.3d 224 (2015).

JL argues that the trial court inappropriately incorporated a best-interest-of-the-child analysis when it determined parental unfitness. He notes that the trial court appeared to believe he was a fit parent because the court directed DSHS not to scrutinize JL's relationship with his new child. He relies heavily on *A.B.* to suggest that the trial court's findings were inconsistent, requiring reversal. We disagree and conclude that substantial evidence supports the trial court's finding.

In *A.B.*, our Supreme Court reversed a termination because the trial court made no explicit finding that the parent was unfit and one could not be implied. 168 Wn.2d at 924. In determining whether the court could imply the necessary finding, the court looked to the findings the trial court did make, and noted that they conflicted on whether the parent was unfit. *Id.* at 922. The court feared that the trial court was inappropriately focusing on A.B.'s best interests rather than the parent's unfitness. *Id.* at 926.

JL's situation is different. There the trial court made *no express finding* of parental unfitness, and the court noted that to imply a finding, it must be clear from the record that the omitted finding "was actually intended, and thus made, by the trial court." *Id.* at 921, 924. In contrast, here the trial court made an *express* finding of parental

10

unfitness. Therefore, the only question here is whether substantial evidence supports the trial court's finding of unfitness.

JL's argument also fails because JL inappropriately relies on the trial court's oral ruling rather than its actual findings. While a trial court's oral opinion may be used to clarify the formal findings when necessary, it is not itself a finding of fact. *State v. Kingman*, 77 Wn.2d 551, 552, 463 P.2d 638 (1970). A party cannot take an oral decision by the trial court and argue that it is inconsistent with the court's written findings in an attempt to impeach those written findings. *Johnson v. Whitman*, 1 Wn. App. 540, 546, 463 P.2d 207 (1969).

JL's remaining argument is essentially that a parent cannot be fit as to one child while simultaneously unfit as to another. We, however, rejected a similar argument in *B.P.*, 188 Wn. App. at 132. This possibility follows logically: what is required to parent an undamaged newborn may be different than what is required to parent a child suffering from severe psychological trauma, especially where the parent caused the trauma. Here, the trial court found that RL suffers from PTSD, Reactive Attachment Disorder, and depression. Significantly, the court found that RL was "damaged by his relationship with his father" and that he suffered "intense trauma . . . while residing with J.L." In such a situation, it is reasonable that JL could be unfit to parent RL, but fit to parent his new baby who does not suffer from these issues.

11

Substantial evidence supports the trial court's finding that JL is currently unfit to

parent RL. The trial court found that RL is "not willing to have contact with his father,"

and RL's therapists "urgently recommend against RL engaging with his father." The

court also recognized RL's significant behavioral difficulties, including "rages" and his

fear of going places because he might run into his father. Where parent and child have no

relationship, the child suffers from fear of the parent, and services cannot repair the

relationship, substantial evidence supports the finding of unfitness. *See K.M.M.*, 187 Wn.

App. at 577.

The finding was supported by substantial evidence.

*Incarcerated Parent Factors*

JL's last two arguments deal with the incarcerated parent factors of RCW

13.34.180(1)(f). The sixth statutory factor requires a trial court find that "continuation of

the parent and child relationship clearly diminishes the child's prospects for early

integration into a stable and permanent home." RCW 13.34.180(1)(f). However, this

inquiry changes if the parent is incarcerated. In 2013, the legislature appended the

following language to the sixth factor:

> If the parent is incarcerated, the court shall consider whether a parent
> maintains a meaningful role in his or her child's life based on factors
> identified in RCW 13.34.145(5)(b); whether the department or supervising
> agency made reasonable efforts as defined in this chapter; and whether
> particular barriers existed as described in RCW 13.34.145(5)(b) including,
> but not limited to, delays or barriers experienced in keeping the agency

apprised of his or her location and in accessing visitation or other meaningful contact with the child.

RCW 13.34.180(1)(f). The plain reading of the statute requires a trial court to consider three additional factors "[i]f the parent is incarcerated." *Id.* The parties dispute whether the amendment applies to this case. JL argues it applies to any parent who was incarcerated *during the dependency*, while DSHS argues that it only applies to parents incarcerated at the *time of the termination.* It is undisputed that JL was not incarcerated at the time of the termination, but was periodically incarcerated during the dependency.

Division One of this court recently interpreted this provision under similar facts in *State v. Saint-Louis*, 188 Wn. App. 905, 355 P.3d 345 (2015). In *Saint-Louis*, the court dealt with a mother who was incarcerated for approximately seven months. *Id.* She was incarcerated when her termination petition was filed, but she was released a month prior to the trial. *Id.* at 911-912. Division One held that the incarcerated parent factors did not apply to her case because she was not incarcerated *at the time of the termination. Id.* at 916.

That reasoning is persuasive. The court looked at the language of the provision and recognized that it is written in the present tense. *Id.* at 917 ("[i]f a parent *is* incarcerated"). The court went on to note that the legislature used different language in other sections of the 2013 law. *Id.* at 917 (referencing a number of places where the legislature referred not just to present incarceration but also to a parent's "prior

13

incarceration"). Ultimately, the court held that the phrase "is incarcerated" is unambiguous, and a trial court only needs to consider the factors if the parent is incarcerated at the time of the termination. *Id.* at 919.

We agree. If the statute's meaning is plain on its face, we apply the plain meaning. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). The amendment reads "[i]f the parent *is* incarcerated." RCW 13.34.180(1)(f) (emphasis added). Because the court is only considering these factors at the time of the termination, the parent "is incarcerated" only if he or she is incarcerated at the time of the termination.

JL argues that this court should read into the dependency statute the words "during the dependency." Under his argument, the statute would read "if the parent is incarcerated during the dependency," then a court considers the three additional factors. Reply Br. at 1. However, in interpreting a statute, an appellate court applies the plain meaning of the statute as written. *Armendariz*, 160 Wn.2d at 110. Had the legislature wanted the statute to read the way JL suggests, it could have easily added the two words JL desires. An appellate court "will not add language to a clear statute." *Wash. State Coal. for the Homeless v. Dep't of Soc. & Health Servs.*, 133 Wn.2d 894, 904, 949 P.2d 1291 (1997).

14

No. 32938-1-III
*In the Welfare of RL*

We hold that the additional incarceration factors of RCW 13.34.180(1)(f) only apply to parents incarcerated at the time of the termination. Because JL was not incarcerated at the time of the termination, the factors do not apply to this case. Thus, JL's third and fourth arguments fail.

The judgment is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Korsmo, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Lawrence-Berrey, J.

15