# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

In the Matter of the Dependency of ) No. 73399-1-I
)
C.G.R., DOB: 07/12/11 )
)
          Minor Child. )
)
_____ )
)
WASHINGTON STATE DEPARTMENT )
OF SOCIAL & HEALTH SERVICES, )
)
          Respondent )
)
      v. )
)
ROBERT RADDER; ) UNPUBLISHED OPINION
AUNDREA KOPP, )
) FILED: June 27, 2016
          Appellants. )
_____ )

VERELLEN, C.J. — Aundrea Kopp and Robert Radder appeal from an order terminating their parental rights to their son, C.G.R.

Kopp contends the Department of Social and Health Services (Department) failed to give adequate notice that her mental health could constitute a parental deficiency supporting termination. But in supplemental findings, the trial court has clarified that Kopp's substance abuse issues *alone* support termination. Sufficient evidence supports the supplemental findings and the trial court's determination that the Department adequately offered mental health services.

Both parents contend they were denied due process because the court appointed special advocate (CASA) failed to conduct an adequate investigation. But the CASA gathered detailed information about the parents and C.G.R. The alleged deficiencies go to the weight of the CASA's testimony, not to its admissibility. The parents were not denied due process.

As to the remaining arguments, visitation is not a service, the trial court did not abuse its discretion in limiting cross-examination about prospective adoption plans, and the record adequately supports the remaining elements for termination.

Therefore, we affirm the trial court's termination order as to both parents and lift the existing stay.

## FACTS

Aundrea Kopp and Robert Radder are the parents of C.G.R., a boy born in July 2011. In May 2012, Radder's sister contacted Child Protective Services. She reported that Radder saw Kopp using drugs in their home with a drug dealer. Kopp left with the drug dealer and took C.G.R. with her. Radder admitted to the Department that he and Kopp had recently used methamphetamines. Radder failed three urinalyses between May 2012 and July 2012. Kopp pleaded guilty to attempted prescription forgery for oxycodone in August 2012. C.G.R. was removed from his parents' custody later that month.

On October 24, 2012, the trial court entered agreed dependency orders for both parents. The court ordered both parents to provide clean, not missed, and undiluted urinalyses twice per week for 90 days and to complete a substance abuse assessment

2

and to follow any recommended treatment. The court also ordered Radder to complete a domestic violence assessment and to follow any recommended treatment.

Although she participated in several substance abuse programs, Kopp was not successful. She repeatedly relapsed and never satisfied the 90-day urinalysis requirement. Kopp received multiple referrals for substance abuse assessment, urinalysis testing, and recommended treatment.

In April 2013, Intercept Associates, an outpatient substance abuse program, evaluated Kopp. Kopp was self-medicating with daily marijuana use in part to control her anxiety and depression. Kopp began a recommended nine-month outpatient substance abuse treatment program at Intercept. After "progressing well," she struggled with consistent attendance.[1] Kopp relapsed. In June 2013, Intercept recommended Kopp for inpatient treatment. A month later, she was discharged from the Intercept program.

When the Division of Behavioral Health and Recovery evaluated Kopp in early April 2013, Kopp indicated that treatment for her "psychological problems" was extremely important, that she was "in need" of mental health services, and that she had experienced "serious anxiety/tension" in the past 30 days.[2] Social worker Amanda Potter recommended a Foster Care Assessment Program (FCAP) reunification assessment. Both parents agreed. In July 2013, social worker Paula Solomon completed the FCAP reunification assessment report. Solomon met with Kopp several times and noted that Kopp "demonstrated positive parenting skills and a strong bond"

---

[1] Ex. 79.
[2] Ex. 74 at 6.

with C.G.R.[3] Solomon recommended that Kopp complete substance abuse treatment, engage in mental health treatment using cognitive behavioral therapy, and receive a psychiatric assessment for mental health medications. Kopp had "participated in mental health at Valley Cities in the past, and she had indicated she would be interested in going there again."[4] Solomon read the FCAP report recommendations to Kopp "about being able to get cognitive behavioral therapy at Valley Cities where she had been before."[5] At the time of the termination trial, Kopp was in the process of applying for services with Valley Cities, but had not completed the process. Kopp did not enroll for mental health treatment at Valley Cities or elsewhere. She did not seek a psychiatric evaluation.

Beginning in September 2013, Kopp began 30 days of inpatient treatment at Sundown M Ranch. Social worker Potter advised Kopp to follow Sundown's treatment recommendations and recommended that Kopp engage in mental health treatment using cognitive behavioral therapy and obtain a psychiatric evaluation. Sundown referred Kopp to Evergreen Manor for long term inpatient treatment. In October 2013, Kopp began inpatient treatment at Evergreen Manor, but left a week later. Evergreen recommended that Kopp complete long term residential treatment and mental health services. Kopp declined to participate further in treatment at Evergreen.

In November 2013, Kopp reentered outpatient treatment at Intercept. Intercept recommended that Kopp complete an eight-month outpatient treatment program. For the next month, Kopp had "perfect attendance" with group treatment sessions and

---

[3] Ex. 67 at 10.

[4] Report of Proceedings (RP) (Mar. 12, 2015) at 736.

[5] Id. at 759.

established a support system, but failed a urinalysis.[6] In December 2013, Kopp failed two urinalyses. In January 2014, Kopp missed two urinalyses and failed two more. In March 2014, Kopp was placed in phase two of Intercept's treatment program in an attempt to provide her tools to establish sober support in the community. In April 2014, Intercept discharged Kopp from outpatient treatment because she relapsed, stopped responding to letters, and missed several urinalyses.

In its April 2014 Individual Service and Safety Plan report, the Department "highly recommended" that Kopp engage in mental health treatment as an "important part of [her] recovery process."[7] Kopp missed many urinalyses in subsequent months. From April to June 2014, Kopp "missed 16 out of the 22 scheduled urinalysis drug screens."[8]

In May 2014, Kopp admitted using controlled substances. She had not completed substance abuse treatment or satisfied the 90-day urinalysis requirement. Because C.G.R. had been "in out-of-home care for 15 of the last 22 months," the court recommended that the Department file a termination petition.[9]

Kopp again reentered treatment at Intercept. Potter sent Kopp a service letter recommending that she engage in mental health treatment using cognitive behavioral therapy and that she obtain a psychiatric evaluation. A counselor at Intercept provided Kopp "with cognitive behavioral techniques to manage her mental health.[10]

---

[6] Exs. 86-87.

[7] Ex. 118 at 9, 22.

[8] Ex. 96.

[9] Ex. 27 at 3.

[10] Clerk's Papers (CP) at 468 (Finding of Fact (FF) 2.8.36).

5

In June 2014, Intercept again discharged Kopp from treatment. She had not shown significant behavioral changes necessary to be successful in her recovery. The Department filed a termination petition. Potter sent Kopp service letters informing her to enroll in substance abuse treatment and urinalysis testing. Potter again referred her to mental health treatment. Kopp did not provide urinalyses from June to October 2014 or in February 2015.

Social worker Micah Kurtz was assigned to the case in July 2014. Kurtz told Kopp to continue doing her urinalyses and substance abuse treatment. That same month, Kopp pleaded guilty to theft.

Social worker Sihnae Moore was assigned to the case in September 2014. Moore sent Kopp several service letters referring her to a substance abuse assessment and urinalysis testing. Moore stated in the letters that the FCAP program recommended mental health treatment using cognitive behavioral therapy and a psychiatric evaluation. As of November 2014, Kopp had not completed any urinalyses since June 2014.

The Department had problems scheduling visitation for Kopp. From September 2013 to November 2013, Kopp had only two visits with C.G.R. The Department tried to set up visitations while Kopp was in inpatient treatment, but visitation was allowed only on weekends, and C.G.R. became ill once. When Kopp abruptly left Evergreen Manor, visitation was delayed because the visitation plan had to be reworked. After the Department found a new visitation provider, Kopp denied the visitation offer due to scheduling conflicts. The Department agreed that Kopp was "owed" visitation and proposed increasing her visitation hours.[11]

---

[11] Ex. 14 at 3.

In December 2013, the court found that Kopp was entitled to 117 hours of make-up visits. Kopp had only two visits with C.G.R. between July 2013 and December 2013, even though she was available for visits. Kopp's visitation with C.G.R. up to that point had been "positive," she had provided "stable, consistent, and appropriate care" for C.G.R.[12] In January 2014, the court ordered that the Department provide Kopp 159 hours of make-up visits. In February 2014, the court entered an agreed order to permit unsupervised visitation after four weeks of monitored visitation.

Radder worked as a commercial fisherman in Alaska for years. His work schedule varied with the fishing season. He usually signed "a two-month contract" and, when working, he was usually out at sea for "three to twelve days."[13] Between October 2012 and the termination trial in March 2015, Radder made eight trips to Alaska.

Radder received multiple referrals for substance abuse and domestic violence assessments and recommended treatment. He completed the assessments, but not the treatment.

In 2012, social worker Monica Barry referred Radder to Social Treatment Opportunities in Puyallup for urinalysis testing and a substance abuse assessment. Barry also gave Radder "a list of service providers where he could get his domestic violence assessment done."[14] She referred him to services in Puyallup because he wanted to engage in services near his home once he returned from Alaska. Radder never indicated that he did not understand the services that he had to complete.

---

[12] Ex. 14 at 1.

[13] RP (Mar. 19, 2015) at 1259.

[14] RP (Mar. 9, 2015) at 226.

Radder's domestic violence assessment recommended participation in a one-year outpatient treatment program. The assessment also revealed that Radder recently failed a urinalysis. Radder reported using methamphetamines and driving under the influence. From late December 2012 to early January 2013, he failed two urinalyses.

In March 2013, social worker Potter was assigned to the case. Potter sent Radder a letter informing him of her contact information. Potter referred Radder to a substance abuse assessment and informed him of other urinalysis sites more convenient for his work schedule. Potter contacted Radder to determine if he needed assistance with his referrals. Radder's substance abuse assessment recommended outpatient treatment. As of June 2013, Radder had given some urinalyses and had completed a substance abuse and domestic violence assessment, but was not following treatment recommendations.

In July 2013, social worker Solomon recommended that Radder engage in domestic violence and substance abuse treatment. Solomon did not meet with Radder because he was in Alaska.

In August 2013, Potter sent Radder a service letter referring him to a substance abuse assessment, urinalysis testing, and domestic violence treatment and to ensure he had all the information necessary to complete the court-ordered services. Radder "expressed that he knew what he needed to do and where to access services and how to do it."[15]

Radder had another substance abuse assessment, but never returned for recommended treatment. Radder failed a urinalysis and missed several others in

---

[15] Id. at 349.

October 2013. In late November 2013, social worker Potter sent Radder a service letter referring him to substance abuse and domestic violence treatment and urinalysis testing. In the letter, Potter included phone numbers for the services he needed to access and her contact information. Radder missed scheduled urinalyses.

Radder did not complete the recommendations in the FCAP assessment report. Radder was "not really involved" with C.G.R.[16]

In April 2014, the Department issued its Individual Service and Safety Plan report stating that Radder needed to follow through with treatment recommendations. The report noted that Radder's visits had been sporadic. Later that month, Potter sent Radder a service letter referring him to reengage in substance abuse and domestic violence treatment.

In June 2014, the Department filed a termination petition.

Social worker Micah Kurtz was assigned to the case in July 2014. Kurtz did not have any contact with Radder. In the fall of 2014, new social worker Sihnae Moore sent Radder a service letter referring him to substance abuse and domestic violence treatment and urinalysis testing. Moore made several unsuccessful attempts to contact Radder "to find out where his location was so that [she] could make a referral to [urinalyses] that were in his area."[17]

Moore met Radder for the first time in October 2014 and gave him a service letter. Moore called Radder several times, to no avail. Radder never tried to contact Moore. Nor did Radder ask Moore for a referral to services in Alaska. Radder never

---

[16] Ex. 68.
[17] RP (Mar. 10, 2015) at 393.

began domestic violence treatment. He did not satisfy the 90-day urinalysis requirement.

Nine months after having filed a termination petition, trial begin on March 9, 2015, and lasted eight days. In April 2015, the trial court entered an order terminating Kopp's and Radder's parental rights. The court found that the Department proved the elements of RCW 13.34.180(1), concluded that both parents were currently unfit to parent C.G.R., and entered a termination order as to both parents.

Kopp and Radder appeal the termination order.

## ANALYSIS

### Standard of Review

We review an order terminating parental rights to determine if substantial evidence supports the court's findings and if those findings in turn support its conclusions.[18] "'Substantial evidence is evidence sufficient to persuade a fair-minded rational person of the truth of the declared premise.'"[19] "Unchallenged findings are verities on appeal."[20] The trier of fact alone makes credibility determinations.[21]

The Department must prove six statutory elements—only three of which are at issue here—by clear, cogent, and convincing evidence:

> (1)    the services ordered have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the

---

[18] In re Welfare of K.M.M., 187 Wn. App. 545, 564, 349 P.3d 929 (2015), review granted, 184 Wn.2d 1026 (2016).

[19] Id. (quoting In re Welfare of C.B., 134 Wn. App. 942, 953, 143 P.3d 846 (2006)).

[20] In re Dependency of M.S.R., 174 Wn.2d 1, 9, 271 P.3d 234 (2012).

[21] In re Dependency of A.M.M., 182 Wn. App. 776, 786, 332 P.3d 500 (2014).

foreseeable future have been expressly and understandably offered or provided;

(2)    there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; and

(3)    continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.[22]

"Clear, cogent, and convincing evidence exists when the ultimate fact in issue is 'highly probable.'"[23] The Department "must also prove by a preponderance of the evidence that termination of parental rights is in the child's best interests."[24]

*Lack of Notice That Kopp's Mental Illness May be Grounds for Termination*

Kopp argues she was not given adequate notice that her mental health was an alleged parental deficiency that may support termination. The Department recognized that Kopp had "a long history of mental illness."[25] As early as April 2013, the Department knew that Kopp could benefit from mental health treatment.[26] The Department sent Kopp many referral letters for mental health treatment.[27] Solomon read the FCAP recommendations to Kopp "about being able to get cognitive behavioral therapy at Valley Cities where she had been before."[28] The Department and the FCAP report recommended mental health treatment for Kopp. The FCAP report noted that

---

[22] RCW 13.34.180(1)(d)-(f); In re Dependency of K.D.S., 176 Wn.2d 644, 652 n.3, 294 P.3d 695 (2013).

[23] K.M.M., 187 Wn. App. at 564-65 (quoting In re Dependency of K.C.S., 137 Wn.2d 918, 925, 976 P.2d 113 (1999)).

[24] Id. at 565.

[25] CP at 117.

[26] Ex. 74.

[27] See Exs. 58, 64, 65, 103, 109; CP at 467-68 (unchallenged FF 2.8.31-35).

[28] RP (Mar. 12, 2015) at 759.

Kopp presented "two major risk areas in terms of her substance abuse and mental health."[29] In closing at trial, Kopp's counsel argued that "[n]obody ever explained to Ms. Kopp what [cognitive-behavioral therapy] was, why it was important, [and] that it was supposed to change her behavior."[30]

The court found in its termination order that Kopp "did not engage in mental health treatment,"[31] her "past and continuing mental health problems are serious deficiencies,"[32] and her "parenting deficiencies" prevent her from "providing [C.G.R.] with basic nurture, health, or safety."[33] In its oral ruling, the court also stated that there is little likelihood Kopp's parental deficiencies, including her mental health issues, would be remedied.[34] The court made extensive findings about Kopp's substance abuse problems and her failure to consistently engage in treatment.[35] In supplemental findings, the trial court has now clarified that Kopp's substance abuse issues *alone* support its decision to terminate Kopp's parental relationship with C.G.R.

In In re Dependency of A.M.M., the court concluded the parent's due process right to adequate notice was violated because the trial court ordered termination based in part on her lack of knowledge about her children's developmental needs even though

---

[29] CP at 314.

[30] RP (Mar. 19, 2015) at 1355.

[31] CP at 471 (FF 2.9.2).

[32] Id. (FF 2.9.1).

[33] Id. at 474 (FF 2.10.5).

[34] RP (Apr. 23, 2015) at 1400-01.

[35] CP at 464-69.

she was not notified that this would be considered a basis for termination.[36] The court

remanded for a determination "whether termination is appropriate on the basis of the

parental deficiencies of which [the mother] was given adequate notice.[37] Here, Kopp

does not dispute she had notice that her substance abuse was an alleged parental

deficiency that could support termination. But even if the Department did not give Kopp

adequate notice that her mental illness was a deficiency that could support termination,

the trial court's recent supplemental findings resolve this issue. Because Kopp's

substance abuse deficiencies alone support termination, lack of notice that mental

illness was an deficiency does not warrant additional relief on appeal.

*Integrated Mental Health Treatment*

Related to her lack of notice argument, Kopp contends that services for

*integrated* substance abuse and mental health treatment were reasonably necessary for

her to successfully engage in substance abuse treatment. According to Kopp, the

Department failed to understandably offer her integrated treatment, therefore, the

termination order must be reversed. We disagree.

The Department must expressly and understandably offer or provide all court-

ordered services and "all necessary services, reasonably available, capable of

correcting the parental deficiencies within the foreseeable future."[38] "A service is

---

[36] 182 Wn. App. 776, 791-93, 332 P.3d 500 (2014); see also In re Termination of F.M.O., No. 33339-6-III, slip. op. at 8-9 (Wash. Ct. App. May 24, 2016) (lack of notice of recurring incarceration as parental deficiency requires remand to determine whether termination is appropriate based on deficiencies of which the mother was given adequate notice.)

[37] Id. at 792-93.

[38] RCW 13.34.180(1)(d); In re Dependency of T.L.G., 126 Wn. App. 181, 200, 108 P.3d 156 (2005).

'necessary' . . . if it is needed to address a condition that precludes reunification of the parent and child."[39] "The services offered must be individually tailored to a parent's specific needs."[40]

First, the record supports that Kopp did receive some integrated treatment. Intercept provided Kopp "with cognitive behavioral techniques to manage her mental health" and "to help with negative self talk."[41] Counselor Rick Sherman testified that Kopp benefited from cognitive behavioral techniques taught at Intercept.[42] Kopp also acknowledged that mental health treatment at Intercept and Sundown was helpful:

> [T]he counseling through Intercept and as well as Sundown helped a lot with mental health. I learned at Sundown, even, why I am an addict or . . . what causes that or . . . why . . . certain behaviors was [sic] a character flaw. I mean, I learned a lot through the programs and a lot of it does—it's mental.[43]

Second, Kopp argues that Potter and Moore did not explain to her what cognitive behavioral therapy meant.[44] But the multiple referrals expressly mention mental health treatment. For example, social worker Potter advised Kopp in writing that she could obtain "Evidence Based *Mental Health Treatment*—utilizing cognitive behavioral therapy (CBT)" and a psychiatric evaluation "to determine medications *to address mental health concerns*" at either Valley Cities or Sound Mental Health.[45] The FCAP report expressly

---

[39] A.M.M., 182 Wn. App. at 793.

[40] In re Dependency of D.L.B., 188 Wn. App. 905, 920, 355 P.3d 345 (2015), review granted, 184 Wn.2d 1034 (2016); see also In re Termination of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011) (same).

[41] CP at 468 (FF 2.8.36).

[42] RP (Mar. 16, 2015) at 836-37.

[43] Id. at 901.

[44] See RP (Mar. 10, 2015) at 485-86; RP (Mar. 12, 2015) at 690.

[45] Ex. 64 (emphasis added).

recommends "evidence based *mental health treatment*" utilizing cognitive behavior therapy and to get a psychiatric evaluation to determine medications to address "*mental health concerns (anxiety)*."[46] Social worker Solomon specifically read those recommendations to Kopp and told her she could obtain those services at Valley Cities, where she had previously received counseling.[47] Yet despite her own declarations that she knew she needed mental health treatment, Kopp failed to follow up on those repeated referrals. She waited until just before the termination trial to even apply to Valley Cities.

Third, Kopp notes that her testimony suggested she did not understand the difference between a psychological and psychiatric evaluation, but the referrals expressly stated that the recommended psychiatric evaluation was to determine possible mental health medications. Early in the dependency, Kopp admitted she had been self-medicating to address her depression and anxiety. Referrals to seek possible mental health medications do not seem confusing.

Fourth, Kopp testified that if the court had ordered her to engage in cognitive behavioral therapy and to obtain a psychiatric evaluation, she would have done so. But early in the dependency, Kopp acknowledged her need for mental health services. It is inconsistent to suggest that lack of a court order precluded her from obtaining necessary services offered by the Department.

Finally, Kopp's reliance upon In re Termination of S.J. is unpersuasive.[48] In S.J., the Department failed to provide needed and court-ordered mental health services

---

[46] Ex. 67 at 10 (emphasis added).

[47] RP (Mar. 12, 2015) at 759.

[48] 162 Wn. App. 873, 256 P.3d 470 (2011).

because it required a "sequential approach" in which the mother had to first address her substance abuse problem.[49] Despite knowing of her mental health issues, the Department did not refer the mother to mental health services until late in the dependency period. After failing three times in a year to complete inpatient drug treatment, she succeeded soon after receiving mental health services.[50]

The mother argued on appeal that "coexistent mental health services were necessary for successful early treatment."[51] The S.J. court determined the mother's inability to complete inpatient treatment was linked to her mental health issues.[52] Had the Department offered the mother coexistent treatment sooner, the court determined she would have been able to recover in time to properly parent her child.[53] The court noted the legislative finding that "'integrated treatment of co-occurring disorders is critical to successful outcomes and recovery.'"[54] The court concluded the Department failed to offer and timely provide the mother all necessary services because, by not integrating the ordered services, the Department did not tailor the services to her "co-occurring problems."[55]

Here, the Department did not take a sequential approach. Throughout the dependency, several social workers and evaluators recommended that Kopp undertake both substance abuse and mental health treatment, but she did not follow up on those

---

[49] Id. at 881-82.

[50] Id.

[51] Id. at 882.

[52] Id. at 881-82.

[53] Id.

[54] Id. at 882 (quoting LAWS OF 2005, ch. 504, § 101).

[55] Id.

referrals. Unlike S.J., Kopp was not denied mental health services until she successfully completed substance abuse treatment.[56]

Therefore, we conclude the record supports the trial court's determination that the Department adequately offered or provided all necessary services, reasonably available, capable of correcting Kopp's parental deficiencies within the near future.

### CASA's Failure to Investigate

Both parents challenge the adequacy of the CASA's investigation. Specifically, Kopp contends the CASA's failure to "conduct a timely, independent investigation regarding C.G.R.'s best interests and Kopp's parental deficiencies" violated her due process rights.[57] Radder argues the CASA's failure to speak to him and to observe him with C.G.R. violated his due process rights. We disagree.

The parents did not raise this due process issue below. A party may raise for the first time on appeal a "manifest error affecting a constitutional right."[58] The error must be "truly of constitutional magnitude."[59] An error is "manifest" if it had "practical and

---

[56] The court in S.J. also relied on the mother's success in becoming sober once she received mental health treatment late in the dependency. "The situation suggests the mental health services helped her get sober." Id. Here, there is no such correlation between the mental health counseling Kopp received and any progress in substance abuse treatment.

[57] Appellant's Br. at 26.

[58] RAP 2.5(a); see also In re Dependency of A.W., 53 Wn. App. 22, 27, 765 P.2d 307 (1988) ("errors of constitutional magnitude may be raised for the first time in the appellate court") (citing RAP 2.5(a)(3)); A.M.M., 182 Wn. App. at 790 (same).

[59] State v. Scott, 110 Wn.2d 682, 688, 757 P.2d 492 (1988).

identifiable consequences in the case," i.e., actual prejudice.[60] The error must be "'so obvious on the record'" that it warrants appellate review.[61]

In dependency proceedings, a guardian ad litem (GAL) and a CASA have similar responsibilities.[62] They advocate on behalf of the child's best interests.[63] A CASA must (1) investigate, collect relevant information about the child's best interests, and report such information to the court; (2) meet with, interview, or observe the child, and report to the court any views or positions expressed by the child on issues pending before the court; (3) make recommendations based upon an independent investigation of the child's best interests; and (4) represent and be an advocate for the child's best interests.[64] A CASA must "make reasonable efforts to become informed about the facts of the case and to contact all parties" and "examine material information and sources of information, taking into account the positions of the parties."[65]

Here, the CASA Pamela Beatty read the dependency file and all the social workers' reports. She spoke to social workers Barry, Moore, and Porter. Beatty met C.G.R. and regularly observed him at his caregivers' home until February 2015. Beatty spoke to C.G.R.'s caregivers. Beatty collected information from several family members, including Radder's mother and his girlfriend. Beatty attended the dependency hearings and spent 130 hours on the case before trial. Beatty

---

[60] State v. Schaler, 169 Wn.2d 274, 284, 236 P.3d 858 (2010).

[61] Id. (quoting State v. O'Hara, 167 Wn.2d 91, 99, 217 P.3d 756 (2009)).

[62] RCW 13.34.030(11).

[63] GALR 2(a); RCW 13.34.100(1); see also In re Dependency of J.B.S., 122 Wn.2d 131, 139, 856 P.2d 694 (1993).

[64] RCW 13.34.105(1)(a)-(h); GALR 3.

[65] GALR 2(g).

unsuccessfully tried to call Radder once. Beatty found it "challenging catching up with him" because of his work in Alaska.[66] Beatty did not observe and had not read any reports about Radder's visitation with C.G.R.

Importantly, neither parent challenged the foundation or admissibility of the CASA's testimony. Both parents had a full opportunity to cross-examine her and to expose any potential weaknesses in her testimony, but did not cross-examine her about the adequacy of her investigation. Nor did counsel argue below that Beatty failed in her duty. The parents do not indicate what helpful information Beatty may have found if she had done a more thorough investigation.

The parents rely upon general due process requirements for a termination such as "notice, an opportunity to be heard and defend, and the right to be represented by counsel."[67] A CASA has a duty to investigate the case and meet with or observe the child, but the particulars of the investigation are left to the CASA. And even if a CASA violates statutory requirements, relief on appeal is *not necessarily* warranted.[68] Consistent with her duties, Beatty investigated the case in detail related to C.G.R.'s best interests. She gathered extensive information about both parents and C.G.R. Therefore, we conclude on this record that the CASA's investigation does not present an issue of manifest constitutional error.

---

[66] RP (Mar. 17, 2015) at 989.

[67] In re Welfare of L.R., 180 Wn. App. 717, 723, 324 P.3d 737 (2014); see also RCW 13.34.090.

[68] See In re Dependency of P.H.V.S., 186 Wn. App. 167, 180-81, 339 P.3d 225 (2014) (failure of an incapacitated parent's GAL to appear at the morning session of the third day of a dependency hearing in violation of statute was a due process violation, but was harmless error).

Even if the CASA violated a statutory duty or court rule, any error was harmless. Only one of the more than 100 trial court findings related to the CASA. The court found the CASA's testimony credible that Kopp is unable to manage her own needs, cannot keep her own life stable and safe, and therefore is unable to keep C.G.R. safe on a full-time basis. As to Rudder, the CASA concluded he was an absent parent, without a clear plan to be available to care for C.G.R. He has not addressed his chemical dependency and domestic violence issues. The trial court agreed with the CASA's conclusion that termination was in the best interests of C.G.R. But there is ample other evidence addressing each of these points, especially the testimony of the social workers. And the court expressly found Kopp and Rudder were not credible when they alleged they would promptly address their deficiencies and provide a safe environment for C.G.R.

We normally expect evidence of efforts by the CASA to contact a parent in writing as well as by relaying messages through friends, relatives, and counsel. But Rudder had contact information for the social workers and the CASA and did not maintain contact with any of them. Any deficiencies in the CASA's investigation here go to the weight, not the admissibility, of her testimony. And we defer to a trial judge's credibility determinations.

Therefore, we conclude the parents fail to establish any manifest constitutional error or actual prejudice arising from the alleged deficiencies in the CASA's investigation.

*Likelihood of Remedying Deficiencies*

Both parents contend the Department failed to prove that there was little likelihood their parental deficiencies would not be remedied in the near future. Kopp specifically contends the Department failed to prove a nexus between her drug use and her fitness to parent. We disagree.

The primary purpose of a dependency is "to alleviate the problems that prompted the State's initial intervention."[69] There must be a relationship between the deficiencies and parenting ability.[70] The focus of RCW 13.34.180(1)(e) is if "'parental deficiencies have been corrected.'"[71] The Department must prove there is little likelihood that parental deficiencies can be remedied in the near future.[72] To satisfy this burden, the Department must prove that the parent's current deficiencies prevent the parent from providing the child with "basic nurture, health, or safety."[73] The court may consider a parent's documented failed treatment attempts.[74] "If all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future are offered or provided, and the parental deficiencies are not substantially improved within 12

---

[69] In re Dependency of T.L.G., 126 Wn. App. 181, 203, 108 P.3d 156 (2005).

[70] Id.

[71] In re Dependency of T.R., 108 Wn. App. 149, 165, 29 P.3d 1275 (2001) (quoting In re Dependency of K.R., 128 Wn.2d 129, 144, 904 P.2d 1132 (1995)).

[72] RCW 13.34.180(1)(e).

[73] In re Welfare of A.B., 181 Wn. App. 45, 61, 323 P.3d 1062 (2014); see also C.B., 134 Wn. App. at 953 (the Department "may not rely solely on past performance" to prove present parental unfitness).

[74] RCW 13.34.180(1)(e)(i).

months of the dependency order, a rebuttable presumption arises that this factor is established."[75]

Radder sporadically participated in and failed to complete required treatment within 12 months of the dependency order. While Social Treatment Opportunities recommended Radder complete a one-year domestic violence treatment program, Radder never undertook such treatment.

The trial court found, and it is unchallenged on appeal, that Radder's "past and continuing absence from the child and his past and continuing untreated substance abuse problems are serious deficiencies that prevent him from being able to provide adequate parenting services to the child."[76] The court also found that Radder "had not consistently provided for the child's basic needs throughout this case."[77] Social worker Potter testified that she was concerned about Radder's domestic violence and his "use of drugs and alcohol and how that impairs his judgment and ability to safely parent."[78] Potter was also concerned about Radder "perpetrating domestic violence" and "how that affects his ability to safely parent and how that would affect [C.G.R.]."[79] Potter testified that there was little likelihood Radder's parental deficiencies would be remedied in six months. Beatty testified that C.G.R.'s "near future" was six months.[80] Radder took no meaningful steps to address his parental deficiencies and offered no evidence to rebut

---

[75] T.R., 108 Wn. App. at 165 (citing RCW 13.34.180(1)(e)).

[76] CP at 472 (unchallenged FF 2.9.3).

[77] Id. (unchallenged FF 2.9.5).

[78] RP (Mar. 10, 2015) at 498.

[79] Id.

[80] RP (Mar. 17, 2015) at 980; RP (Mar. 18, 2015) at 1226.

the presumption that his parental deficiencies would not be remedied in the near future.

The record also supports that Kopp's parental deficiencies prevented her from providing C.G.R. with basic nurture, health, or safety. Kopp has a history of multiple failed treatment attempts and failed urinalyses. Kopp admitted she was "currently smoking marijuana."[81] Social worker Moore testified that a parent's drug use impacts the ability to provide safety and supervision to a child. Moore testified that "individuals who have substance abuse issues may have difficulty with judgment and making good decisions. . . . especially with raising a child."[82] Potter testified that Kopp's drug use impacted her judgment ability to safely care and to be fully present for C.G.R., and she worried about C.G.R. "being in [Kopp's] care when she's not sober and her ability to make safe judgment calls and to keep him safe."[83] Kopp tested positive for oxycodone in May 2014 and at the time of termination in March 2015, had not completed any urinalyses since June 2014. Kopp consistently failed urinalyses and failed to complete treatment. Intercept counselor Rick Sherman testified that marijuana and opiate use affect a person's mental state and decision making. At no time since C.G.R. was found dependent in October 2012 has Kopp completed her 90-day urinalysis requirement.

Therefore, substantial evidence supports that trial court's determination that there was little likelihood Kopp's and Radder's parental deficiencies would be remedied in the near future.

---

[81] RP (Mar. 16, 2015) at 849, 896; RP (Mar. 18, 2015) at 1202.

[82] RP (Mar. 12, 2015) at 707.

[83] RP (Mar. 10, 2015) at 515.

*Kopp: Visitation as a Necessary Service*

Kopp contends visitation is a "necessary service" that must be provided under RCW 13.34.180(1)(d), focusing upon recent amendments to federal law.[84] But Washington courts have consistently held that visitation itself is not a service for purposes of proving RCW 13.34.180(1)(d), and recent decisions reject the same federal law argument made by Kopp.[85] Here, visitation is not a service that must be provided or offered.

*Kopp: Restricting Cross-Examination of Adverse Witness*

Kopp contends the trial court violated her due process rights by restricting her cross-examination of an adverse witness. We disagree.

We review a trial court's evidentiary rulings for abuse of discretion.[86] During cross-examination, Kopp's counsel asked social worker Moore if the plan was for C.G.R. "to be adopted by his current caregivers."[87] CASA's counsel objected, arguing the testimony was "not relevant to the parents' fitness."[88] Kopp's counsel argued it was relevant to whether termination diminished C.G.R.'s prospects for early integration into a stable and permanent home. The court sustained the objection, stating that C.G.R.'s possible move to or adoption by another relative was not relevant:

---

[84] Appellant's Br. at 35.

[85] K.M.M., 187 Wn. App. at 572-73 (citing In re Dependency of T.H., 139 Wn. App. 784, 791-92, 162 P.3d 1141 (2007)); see also In re Dependency of O.R.L., 191 Wn. App. 589, 598-600, 364 P.3d 162 (2015).

[86] In re Welfare of Angelo H., 124 Wn. App. 578, 588, 102 P.3d 822 (2004).

[87] RP (Mar. 12, 2015) at 697.

[88] Id.

What happens after this hearing is another issue and presumably other proceedings will decide that. Right now the question is whether or not these requirements of Section 180 are met. And I don't see anything in Section 180 that requires the Department to prove or CASA to prove that this child will go in any particular home if parental rights are terminated.[89]

Kopp's counsel made an offer of proof:

[If Moore] would have been permitted to testify, she would have testified that the Department is currently investigating another relative for potential placement of this child at the request of the grandfather, who is currently the caregiver; that if the child were to be moved, that placement in the home of another relative and adoption by another relative would take a minimum of six months, which is the Department's policy; and that an adoption cannot be finalized by the Department until the child has been in the home of a new placement for a minimum of six months.[90]

A party in a termination proceeding has a right "to introduce evidence" and "to examine witnesses."[91] But the "right to cross-examine witnesses is not absolute" and is "limited by general considerations of relevance."[92] Evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant.[93]

The offer of testimony about the time required for C.G.R.'s potential adoption by another relative or the current caregivers was not relevant. Whether C.G.R. may be adopted by his current caregivers or moved to a new placement is not of consequence to whether the parents' deficiencies would have been remedied in the near future under RCW 13.34.180(1)(e). Nor does the excluded testimony tend to prove whether continuing Kopp's relationship with C.G.R. impedes his prospects for early integration

---

[89] Id. at 698.

[90] Id. at 699.

[91] RCW 13.34.090(1).

[92] State v. Darden, 145 Wn.2d 612, 620-21, 41 P.3d 1189 (2002).

[93] ER 401.

into a stable and permanent home under RCW 13.34.180(1)(f). The Department need not prove that an adoptive home is available at the time of termination.[94] In fact, the court excluded similar testimony two days earlier. Kopp's counsel asked Potter if C.G.R.'s current caregivers would adopt him if the termination petition were granted. CASA's counsel objected, and the court sustained the objection.[95] In this setting, the timeframe for a potential adoption is not of consequence.

Therefore, we conclude the trial court did not abuse its discretion in restricting Kopp's cross-examination of social worker Moore.

### Radder: Provision of Services

Radder contends the Department failed to prove that all reasonably available services capable of correcting parental deficiencies in the near future have been expressly and understandably offered or provided. We disagree.

The Department must expressly and understandably offer or provide all court-ordered services. The Department must also provide or offer "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future."[96] At a minimum, the Department "must provide a parent with a list of referral agencies that provide those services."[97]

The trial court ordered Radder to complete both a substance abuse and domestic violence assessment and any recommended treatment, as well as 90 days of

---

[94] See In re Dependency of K.S.C., 137 Wn.2d 918, 927, 976 P.2d 113 (1999).

[95] See RP (Mar. 10, 2015) at 506 ("I will sustain the objection. I don't know where the child will end up after this hearing or how the ruling will be.").

[96] RCW 13.34.180(1)(d).

[97] In re Dependency of D.A., 124 Wn. App. 644, 651, 102 P.3d 847 (2004).

consistently clean urinalyses. Many unchallenged findings support that the Department offered or provided all necessary and reasonably available services capable of correcting his parental deficiencies in the near future:

-the Department referred him to a substance abuse assessment, urinalysis testing and any recommended treatment in December 2012;[98]

-the Department referred him to a substance abuse assessment in January 2013 and March 2013;[99]

-the Department referred him to urinalysis testing;[100]

-the Department sent him bus tickets and an ORCA card to access the court-ordered services;[101]

-the Department met with him and sent him letters with referrals for substance abuse treatment, urinalysis testing, and a domestic violence assessment and any recommended treatment.[102]

Radder spent several months at a time working in Alaska as a commercial fisherman. Radder told social worker Barry that he wanted to do the services in Washington "once he returned."[103] Radder told social worker Moore that Puyallup was "more convenient for him" to complete his services.[104] Radder never provided the Department his work schedule, and he was "hard to reach and hard to contact" while in

---

[98] CP at 469 (FF 2.8.53); RP (Mar. 9, 2015) at 231 ("He was residing in Puyallup then and this would have been the closest location to him to be able to access the service so as not to create a burden on him.").

[99] Id. at 469-70 (FF 2.8.54 & 2.8.58).

[100] Id. at 470 (FF 2.8.59).

[101] Id. (FF 2.8.62).

[102] Id. (FF 2.8.63); RP (Mar. 9, 2015) at 226.

[103] RP (Mar. 9, 2015) at 226.

[104] RP (Mar. 10, 2015) at 394.

Alaska.[105] Moore assisted Radder in obtaining a substance abuse assessment in Alaska. Multiple times, the Department expressly provided Radder with a list of referral agencies that provided his required treatment. Radder acknowledged that "he knew what he needed to do and where to access services and how to do it."[106] And as recently as December 2014, Moore contacted Radder about "getting services established."[107] Given his remote and isolated work setting and his preference to engage in services in Washington, the Department did tailor the services to Radder's specific needs.

Therefore, we conclude substantial evidence supports that the Department offered or provided all necessary and reasonably available services capable of remedying Radder's parental deficiencies in the near future.

*Radder: Prospects for Integration*

Radder contends the Department failed to prove that continuation of the parent-child relationship clearly diminished C.G.R.'s prospects for integration into a stable and permanent home. We disagree.

The main focus of this factor is "the parent-child relationship" and if it "impedes the child's prospects for integration, not what constitutes a stable and permanent home."[108] The Department need not prove that a stable and permanent home is available at the time of termination.[109] This factor concerns "the continued effect of the

---

[105] Id. at 441.

[106] RP (Mar. 9, 2015) at 349; CP at 470 (FF 2.8.66)

[107] RP (Mar. 19, 2015) at 1317.

[108] K.S.C., 137 Wn.2d at 927.

[109] Id.

legal relationship between parent and child, as an obstacle to adoption; it is especially a concern where children have potential adoption resources."[110] Here, Potter testified that at the time of trial C.G.R. had been in an out-of-home placement for two and a half years. Potter had concerns about Radder's availability to parent because of his work in Alaska. The trial court found Radder's testimony that "he intends to stop working in Alaska" to be present in C.G.R.'s life was not credible.[111]

Therefore, we conclude substantial evidence supports that continuation of the parent-child relationship clearly diminished C.G.R.'s prospects for integration into a stable and permanent home.

### Best Interests

Both parents contend the trial court erred in concluding termination of their parental rights was in C.G.R.'s best interests. We disagree.

Once the Department proves the factors in RCW 13.34.180, the trial court then considers if the Department proved by a preponderance of the evidence that termination is in the child's best interests.[112] This is a fact-specific inquiry.[113] "Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests."[114] Here, C.G.R. had been dependent for two and a half years before termination. Social worker Moore testified that C.G.R. needed stability in his life and that lack of stability can be detrimental to a child. Social

---

[110] In re Dependency of A.C., 123 Wn. App. 244, 250, 98 P.3d 89 (2004) (emphasis omitted).

[111] CP at 471 (FF 2.8.72).

[112] RCW 13.34.190(1)(b).

[113] In re Dependency of A.M., 106 Wn. App. 123, 131, 22 P.3d 828 (2001).

[114] T.R., 108 Wn. App. at 167 (quoting A.W., 53 Wn. App. at 33).

worker Potter testified that C.G.R. "is in a situation where his future is unknown."[115]

Beatty testified that adoption was in C.G.R.'s best interests for purposes of stability.

Therefore, we conclude the record supports the finding that termination of Kopp's and Radar's parental rights is in C.G.R.'s best interests. We affirm the trial court's termination order and lift the existing stay.

WE CONCUR:

---

[115] RP (Mar. 10, 2015) at 473.