**FILED**
**DECEMBER 31, 2019**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to | ) | No. 36523-9-III |
| | ) | |
| J.C. | ) | UNPUBLISHED OPINION |
| | ) | |

SIDDOWAY, J. — The mother of now 5-year-old J.C. appeals the termination of her parental rights, contending that the Department of Children, Youth, and Families[1] failed to demonstrate that she was offered or provided services necessary and capable of correcting her parental deficiencies, that her parent-child relationship prevented J.C. from obtaining permanence, and that termination was in J.C.'s best interests. We affirm.[2]

---

[1] During the pendency of J.C.'s dependency, responsibilities for child welfare transferred from the Department of Social and Health Services to the Department of Children, Youth, and Families. *See* RCW 43.216.906. We refer to both as "the Department" throughout this opinion.

[2] The father's parental rights to J.C. were terminated by default.

No. 36523-9-III
*In re Parental Rights to J.C.*

FACTS AND PROCEDURAL BACKGROUND

On May 3, 2017, the Department received a report that the mother of then 3-year-old J.C. was using methamphetamine, leaving drug paraphernalia within his reach, and, in J.C.'s presence, had slapped J.C.'s 70-year-old maternal great-grandmother in the face during an argument. The mother was arrested for the domestic violence assault and a no-contact order was entered to prevent her further contact with the maternal great-grandmother.

The next day, the Department received a report that the mother had arrived uninvited at J.C.'s paternal grandmother's home at 5:00 a.m., and J.C. was bleeding from the mouth. When questioned by paternal relatives about J.C.'s injury, the mother stated that she, the maternal grandmother, and the maternal great-grandmother were fighting and J.C. got in the middle of it. J.C. was interviewed about what happened that morning and said, "mama smacked me." Sealed Ex. P5 at 3. J.C. appeared small for his age and relatives reported having to bribe him to eat. A relative also reported that the mother was actively using methamphetamine or pills. There were concerns of ongoing violence in the home.

The mother admitted to a social worker that she had violated the no-contact order protecting the maternal great-grandmother but would henceforth comply. She agreed to live with J.C.'s father's relatives. The mother admitted abusing alcohol and taking pain medication that was not prescribed to her in the past, and said she had previously

2

completed alcohol dependence treatment.[3]  She also admitted that she had left a bong in

J.C.'s reach, but denied any current drug abuse or that any illicit drugs were accessible to

J.C.  She admitted J.C. was not up-to-date with well-child appointments and had never

been to a dentist.

The Department soon learned from the paternal relatives with whom the mother

had agreed to live that she had moved out and was not answering her phone.  The

paternal relatives were unsure of her whereabouts and believed she was using

methamphetamine.  They said that when the mother was living with them, she was up all

night with J.C.'s father and would not get up to care for J.C. in the morning.  They

described J.C. as growling when shown affection or attention.

The social worker learned from the maternal great-grandmother that J.C. had been

living with her.  The mother's whereabouts were still unknown.  There were reports that

the maternal great-grandmother was using methamphetamine and unprescribed pain pills.

The maternal grandmother and great-grandmother agreed to do a one-time urinalysis, but

did not show up for their appointments.

On May 22, 2017, the Department filed a dependency petition and J.C. was

removed from his parents' custody.  In addition to concerns about the mother's

---

[3] According to Department records, the mother had been approved for chemical
dependency treatment assistance years earlier, in 2013.

absenteeism and household drug use and domestic violence, the mother was not

employed and did not have the means to care for J.C.'s basic needs.

*May 25, 2017 to year-end 2017*

A shelter care hearing was conducted on <u>May 25, 2017</u>,[4] which the mother

attended. J.C. was placed with a paternal uncle and the uncle's then-fiancée (later his

wife), and the mother was allowed two hours of visitation three times per week. The

mother agreed at the shelter care hearing to successfully complete a chemical dependency

assessment and follow all recommendations, participate in random urinalysis or blood

alcohol (UA/BA) testing and obtain negative results, successfully complete a parenting

assessment and follow all recommendations, and successfully complete mental health

treatment/individual counseling and follow all recommendations. The Department

agreed to provide transportation assistance.

For a period of three months, until mid- to late July 2017, the Department social

worker assigned to the case was able to communicate with the mother, but the mother

made very little progress toward the court-ordered services. On May 30, she failed to

show up for a chemical dependency assessment. She failed to show up for a mental

health and chemical dependency appointment on June 13 or for a parenting assessment

scheduled for June 14. The mother appeared for the first 2 UAs to which she was

---

[4] We underscore the dates of court proceedings.

referred, and tested negative for banned substances. But after appearing at the second UA on June 13, she no-showed for the remaining 13 appointments.

A referral letter that the Department social worker sent to the mother on June 2 offered co-occurring mental health and chemical dependency assessments and treatments, a parenting assessment, random urinalysis, and transportation services in the form of a gas voucher or bus pass. The letter, and all following referral letters, indicated that it was the mother's responsibility to contact service providers and schedule intake appointments, but that the social worker would "gladly help in any way possible." Sealed Ex. P13-1.

Also on June 2, the social worker sent the mother a text message with contact information and hours of operation for an intake agency that offers housing assistance through Catholic Charities and referrals to other community housing resources. Upon learning that the mother was returning to live with J.C.'s maternal great-grandmother in violation of the no-contact order, the social worker encouraged the mother to find other housing.

On June 19, the social worker talked to the mother about rescheduling the parenting assessment and accessing other services. In discussing the missed visitation appointments, the social worker agreed to schedule the appointments later in the day based on the mother's reported difficulty making early appointments.

The Spokane Addiction Recovery Center, the service provider for the mother's missed mental health and chemical dependency appointments, was not willing to schedule other appointments after she missed three assessments. The social worker gave the mother information about other providers, including at least one that provided co-occurring assessments for mental health and chemical dependency. The mother did not follow through with any of the referrals.

Toward the end of July, the mother received a letter from the Department advising her that its investigation into whether she struck J.C. in the mouth on May 4 had been resolved as unfounded. The mother called the social worker assigned to the dependency proceeding on July 25, wanting to know why J.C. had not been returned to her. The social worker tried to explain that the child abuse investigation focused on a specific allegation and the dependency was a separate matter. The social worker encouraged the mother to contact her lawyer for a further explanation. From then on, however, the social worker reports being unable to have a conversation with the mother that did not eventually devolve into the mother yelling and cursing. According to the social worker, after receiving the letter, the mother would not engage in services or discuss anything other than visitation because she believed she did nothing wrong.

The dependency fact-finding hearing was held on July 28, 2017. The mother did not attend. The court entered an order of dependency by default on September 6, 2017.

6

The first dependency review was held on <u>October 11, 2017</u>. It was delayed when the mother did not appear on time, but eventually went forward without her in attendance. The mother's parenting deficiencies were identified as chemical dependency, mental health, parenting skills, and chaotic lifestyle. No services were ordered because the mother was in default. The order indicated that the mother's whereabouts were unknown and she was not regularly attending visitation with J.C. The social worker's report documented that there had been no progress with any of the mother's services and that visitation was sporadic.

Upon leaving the October review hearing, the social worker saw the mother outside the courthouse and spoke with her. The mother was very out of breath, appeared nervous and anxious, was thin, was wearing a lot of makeup, and was carrying a plastic jug of juice. She said her ride had been late. Based on her experience, the social worker believed the mother might be under the influence. The social worker provided the mother with the next hearing date and stressed the need to engage in services. She told the mother that she wanted to help and suggested they meet in person to go over what the mother needed to do. She also pointed out that one of the service providers for co-occurring mental health and chemical dependency treatment was just down the block and the mother could stop there now to schedule an assessment.

At the time of that contact, the mother gave the social worker a new telephone number. The social worker later used the new number in attempting to call the mother, leave messages, and send text messages, but she got no response.

A permanency planning hearing was held on <u>November 15, 2017</u>. The mother did not attend. Her lawyer said the mother was willing to engage in a chemical dependency assessment and an evidence-based parenting program, so those services were ordered. The permanent plan was identified as adoption by the paternal uncle and aunt rather than reunification because there was no progress and the mother did not seem willing to make progress.

*Calendar year 2018*

On January 11, 2018, the social worker sent a letter referring the mother to co-occurring mental health and chemical dependency assessments and treatment, instructing her to ask the provider about domestic violence and anger management programs. The letter asked the mother to call the social worker to schedule a psychological evaluation. It offered transportation assistance in the form of a gas voucher or bus pass.

On <u>January 30, 2018</u>, the Department filed a petition to terminate the mother's parental rights. The petition listed chemical dependency, mental health, inability to meet J.C.'s physical and psychological needs, and unavailability as a parent as the mother's parenting deficiencies, and stated that a chemical dependency assessment and treatment, random urinalysis, parenting assessment, and mental health treatment/individual

counseling had been offered. It alleged that she had failed completely to engage in the offered services with the exception of her limited appearance for UAs.

Another permanency planning hearing was held on March 13, 2018. The mother did not appear, but called in at the end of the hearing and asserted that she did not need services. It was reported to the court during the hearing that the mother had attended only 12 of 28 scheduled visitations, and that her failures to attend had required the Department to make five referrals to three providers. The mother offered the excuse of transportation issues. In addition to previously ordered services, the mother was ordered to complete 30 days of random UAs, a mental health assessment and recommended treatment, and domestic violence services, to be addressed with the mental health provider.

Later that day, the social worker texted with the mother and then spoke with her by phone. The mother argued with the social worker about check-in requirements for visitation with J.C. that had been imposed. The requirements are summarized in the trial court's later unchallenged finding of fact (FF) 22:

> [The mother's] failure to show or arriving late and keeping [J.C.] waiting
> was very hard on him and after a while it just became too much for him
> emotionally. In order to address the "tardiness" barrier to visits, the social
> worker and visit providers attempted various solutions. Visit times were
> changed to later in the day, [the mother] was required to call in and confirm
> that she would be attending the visits and finally she was required to
> physically check in one hour before the visit before [J.C.] would be
> transported. Several providers tried to be lenient with [the mother] and
> allow her more time when she was late for the early check in, but even after

9

> confirming she was on her way to the visit [the mother] would sometimes
> not show up. The early check in times were removed three separate times,
> but [the mother] would still miss visits.

Clerk's Papers (CP) at 239-40. According to the social worker, the conversation then turned, as usual, to the mother's argument that the letter she received in July 2017 said she did nothing wrong. The social worker encouraged the mother to speak with her lawyer.

On April 26, the social worker sent a letter referring the mother to co-occurring mental health and chemical assessment and treatment providers, offering bus passes or gas vouchers, instructing her to call to schedule UAs and a parenting assessment, and reminding her of the next hearing and the time and location for visitation. The mother's last visit with J.C. was on April 24. After three more missed visits, a new referral was made on May 3 to reinitiate visits, but the mother never sought to resume visitation.

The social worker sent a further referral letter on July 6 that was essentially identical to the previous letter except that it did not provide details about visitation.

On August 15, the mother's court-appointed lawyer notified the parties to the dependency proceeding that due to absence of contact with the mother, she would be filing a motion to withdraw.

A dependency review hearing was held on August 28, 2018. The mother did not attend. The mother was noncompliant with all court-ordered services and it was reported

she believed she did not need services.  Visitation was cancelled unless otherwise agreed by the parties or by motion.

The superior court entered an order on September 13 allowing the mother's lawyer to withdraw.  The order, presented by the mother's lawyer, stated that the lawyer had "no consistent contact with [the mother] for a significant period time [sic]."  CP at 147.  Although the termination trial was scheduled for October 3, the mother's request for a continuance was granted after the mother's lawyer agreed to be reappointed and the mother declared her understanding that "I need to stay in contact with [my lawyer]."  CP at 157.

A two-day termination trial began on October 22, 2018.  The Department presented seven witnesses.  The mother testified on her own behalf.

In addition to elaborating on the history of the dependency recounted above, there was testimony that when the mother *did* attend visitation, her interactions with J.C. were positive.

The Department social worker testified that she had spoken to the mother about what was preventing her from being on time for visitation.  The mother reported struggling with early morning appointments and transportation issues.  The social worker offered bus passes and gas vouchers to address the transportation issues and found a visitation provider that could schedule visits in the afternoon.  She testified that the accommodations made no impact.

The social worker testified that at no time during the dependency had the mother demonstrated a willingness to participate in services that could remedy her parental deficiencies. The social worker did not believe there was anything else she could have done to get the mother to engage. She also testified that if the mother suddenly relented and began participating in services, she would not be equipped to take custody of J.C. for at least three to six months. She expressed the view that termination was in J.C.'s best interest because he had bonded with his uncle's family, was happy and safe there, and could continue to be in contact with his extended family.

The guardian ad litem testified that with co-occurring mental health and drug issues it can take years for a parent to become stable. Noting that the mother's only effort to comply with services had been her efforts to participate in some visitation, the guardian ad litem testified that the effort "shows that she still wants to *see* her child, but it doesn't show that she wants to *parent* her child." Report of Proceedings (RP)[5] at 190 (emphasis added). She pointed out that termination was the only way for J.C. to be adopted without a voluntary relinquishment.

The mother testified on her own behalf, largely disputing the social worker's testimony about the extent of the social worker's efforts and her (the mother's) alleged lack of cooperation. She testified to having cognitive difficulties—cognitive difficulties

---

[5] All references are to the report of the termination trial proceedings.

that do not appear to have been raised by the mother or her lawyer at any prior time during the 17 month dependency:

> My brain is really flustered. In school I've never been good. When I have a lot of things to do, I have a hard time keeping track of everything. So my whole life I've needed help remembering what needed to be done, what papers I need to get done.
> And time is a really big thing—a hard thing for me doing things on time and everything. It's not intentional. I don't—It's not because I don't care.

RP at 210. The mother testified that in high school she had been in a special "block class" that she described as "the same thing for three or four periods in a row in the same classroom, same teacher. It was only, like, five or six kids in the class. That way we could have more attention with the teacher, more time with them." *Id.* She testified she needs one-on-one, hands-on help. She offered no evidence other than her own testimony that she suffered from a cognitive disability.

The mother also testified during her direct examination that transportation problems prevented her from following up on court-ordered services, explaining that her car "will shut off while I'm driving. I don't know what's wrong . . . . The wheel will lock up. It won't start again until it wants to." RP at 213. She testified that she asked her social worker for help getting her car repaired and the social worker said she would look into it but never got back to her about it. During the Department's case, the social worker had been cross-examined about such a request by the mother and did not recall it.

Asked if such financial assistance was possible, she answered it was difficult to get approval but she had heard of it happening if the type and cost of repair were known.

The mother testified that taking a bus "would have never worked," because "I think we all know I have a tardiness problem," and "[t]he bus stop was a mile and a half from my house." RP at 219. She added, "I don't even remember how to take a bus, to be honest." *Id.*

During cross-examination, the Department's lawyer followed up on the bus alternative with the then-24-year-old mother:

Q.  Is there a reason that you can't walk?

A.  Walk?

Q.  You have a physical disability?

A.  Do you know how long it would take me to walk? I live on Upriver Drive right across the street from the dam. I was—would have never made it anywhere walking.

Q.  I'm talking walking to the bus.

A.  Yeah. I could walk to the bus. It would have been very difficult and cold. Cold or hot. It would have taken me a really long time to get anywhere.

RP at 241-42.

The mother agreed that J.C. "needs a stable home right away," but told the court, "I promise you I will have a job, I will have my own place within a few months, I promise." RP at 226.

During closing argument, the mother's attorney suggested that perhaps J.C.'s uncle and aunt would be open to a guardianship or a third-party custody agreement. No

14

evidence had been presented about either option. In rebuttal, the Department's lawyer

observed that there was no guardianship petition before the court. She also pointed to the

record of the permanency planning hearing at which the uncle and aunt had been present:

> They gave—they spoke to the Court. Had an opportunity to be heard. And the permanent plan was made and was specified as adoption. It's part of permanency planning. Those issues are discussed with placement, options are given, and here we are. Adoption is the permanent plan.

RP at 275.

The trial court took the matter under advisement and reconvened the parties a

couple of weeks later to announce that the State had met its evidentiary burden and the

court would terminate the mother's parental rights. Written findings of fact and

conclusions of law were entered thereafter. The mother appeals.

## ANALYSIS

"The fundamental liberty interest of natural parents in the care, custody, and

management of their child does not evaporate simply because they have not been model

parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*,

455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Because parents have a

fundamental liberty interest in the custody and care of their children, the Department may

terminate parental rights "'only for the most powerful [of] reasons.'" *In re Welfare of

S.J.*, 162 Wn. App. 873, 880, 256 P.3d 470 (2011) (alteration in original) (quoting *In re

Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)).

15

Washington's termination of parental rights statute responds to this constitutional command by providing a two-step process before a court may terminate parental rights.

In the first step of the process, the State must prove six statutory elements provided by RCW 13.34.180(1).[6]  These elements "focus[ ] on the adequacy of the parents and must be proved by clear, cogent, and convincing evidence."  *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010) (footnote omitted).  "Clear, cogent and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable."  *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999).  In addition to finding the statutory elements, due process requires that a court make a finding of current parental unfitness before parental rights can be terminated.  *In re Dependency of K.R.*, 128 Wn.2d 129, 142, 904 P.2d 1132 (1995) (citing *Santosky*, 455 U.S. at 747-48).  This finding need not be made explicitly and satisfying all six of the statutory elements raises an implied finding of parental unfitness.  *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 479, 379 P.3d 75 (2016).

The second step is for the court to ascertain the best interests of the child.  RCW 13.34.190(1)(b).  "Because the parent's rights will already have been observed in the first

---

[6] The first three elements, at RCW 13.34.180(1)(a)-(c), are procedural and are seldom in dispute.

16

step, this second step need be proved by only a preponderance of the evidence." *A.B.*, 168 Wn.2d at 912.

In this case, the mother argues that the Department failed to establish two of the elements required in the first step: that it had provided all necessary services, as required by RCW 13.34.180(d), and that continuation of the parent and child relationship prevented J.C. from obtaining permanency, as required by RCW 13.34.180(f). She argues that the Department failed to prove at the second step that termination was in J.C.'s best interests as required by RCW 13.34.190.

I. STEP ONE: PROVING THE PARENTAL INADEQUACY ELEMENTS

The mother argues the Department failed to prove the statutory elements required by RCW 13.34.180(1)(d) and (f), which require proof:

> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided; [and]
> . . . .
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

We address the sufficiency of the evidence to prove the elements in turn.

    A.    The Department's obligation to offer necessary, tailored, services.

17

The mother identifies the necessary services that the Department failed to offer as "services addressing life skills, such as assistance with obtaining a phone, calendaring, time management, and using public transportation." Mot. for Accelerated Review at 13.

To satisfy its burden under RCW 13.34.180(1)(d), the Department is required to prove not only that it provided all court-ordered services but also that it provided any other service, not court-ordered, that is necessary, reasonably available, and capable of correcting the parental deficiencies within the foreseeable future. *K.M.M.*, 186 Wn.2d at 479. "Necessary services" is not statutorily defined, but case law has defined the term to mean "those services 'needed to address a condition that precludes reunification of the parent and child.'" *Id.* at 480 (quoting *In re Dependency of A.M.M.*, 182 Wn. App. 776, 793, 332 P.3d 500 (2014)).

The trial court found that all necessary services were expressly or understandably offered or provided by the Department. On review, the court's factual findings on the statutory elements must be upheld "if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." *K.S.C.*, 137 Wn.2d at 925. Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the fact at issue. *S.J.*, 162 Wn. App. at 881. "Clear, cogent and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable." *K.S.C.*, 137 Wn.2d at 925.

18

At issue first is whether the record contains evidence that assistance to the mother in obtaining a phone, calendaring, time management, or using public transportation was "needed" to address a condition that precluded the mother's reunification with J.C. The mother likens her case to *In re Parental Rights to I.M.-M.*, 196 Wn. App. 914, 385 P.3d 268 (2016). But in that case, there was clear evidence of a cognitive impairment. The Department had reason to believe that the mother, C.M., was cognitively impaired at the time it filed the dependency petition. *Id.* at 918. Impairment was confirmed when C.M. promptly completed a court-ordered psychological evaluation. *Id.* She was determined to be significantly cognitively impaired, with an IQ lower than 91 percent of individuals her age, "raising 'concerns about her . . . ability to hold a job, pay bills, [and] take care of herself.'" *Id.* (alterations in original). The psychologist who evaluated C.M. connected her impairment to difficulties she would likely face in completing reunification services. It was the Department's failure to heed these findings that caused this court to reverse the termination decision and remand the matter to the trial court for further proceedings.

By contrast, the mother in this case fails to identify any notice to the Department prior to the termination trial that a cognitive defect accounted for her absenteeism and tardiness. At trial, the mother testified that she had attended high school. While she claims not to have done well in school and to have attended a special block class, she offered no other evidence of a cognitive impairment rendering her unable, without assistance, to obtain a phone, maintain a calendar, or take a bus. She did not testify at the

19

termination trial that she was *unable* to do those things. There was evidence of phone

replacements that had not required Department assistance[7] and she testified, "I don't even

*remember* how to take a bus," not that she was incapable of figuring it out. RP at 219

(emphasis added). She testified to a "tardiness problem" she had been able to work on

while recently incarcerated at Geiger Correctional Center and that she had gotten "a lot

faster." RP at 239. She told the court, "I promise you I will have a job, I will have my

own place within a few months, I promise." RP at 226.

The mother also offered no evidence that phone, calendaring, and bus riding

assistance services were reasonably available and capable of correcting her parental

deficiencies within the foreseeable future.

Assuming such services existed, the Department is excused from offering or

providing services if doing so would have been futile. *I.M.-M.*, 196 Wn. App. at 924.

"[A] parent's unwillingness or inability to make use of the services provided excuses the

State from offering extra services that might have been helpful." *In re Dependency of*

*Ramquist*, 52 Wn. App. 854, 861, 765 P.2d 30 (1988) (citing *In re Welfare of Ferguson*,

---

[7] The evidence suggests the mother encountered a barrier to communicating only when it came to her need to schedule and engage in services; she was generally able to make contact with the social worker and service providers about visitation. Visitation coordinators described the mother calling in to confirm her appointment time, to explain that she would be late, to ask that they not cancel the visit due to her tardiness, and to complain when visits were cancelled. At trial, the mother even accused the social worker of lying that only a phone (not physical) check-in had been required for a particular visit because "[i]f it was a phone call, I would have made it." RP at 244.

41 Wn. App. 1, 6, 701 P.2d 513 (1985)). Typically a pattern of unwillingness to engage is sufficient to establish that offering additional services was futile. *Ramquist*, 52 Wn. App. at 861. Washington cases hold that services are futile if they "would not remedy the parental deficiencies within the foreseeable future for the child." *In re Parental Rights to K.M.M.*, 187 Wn. App. 545, 567 n.8, 349 P.3d 929 (2015) (citing *In re Welfare of Hall*, 99 Wn.2d 842, 851, 664 P.2d 1245 (1983)), *aff'd*, 186 Wn.2d 466, 379 P.3d 75 (2016). This is "a factual inquiry evaluated from 'the child's point of view.'" *In re Dependency of D.L.B.*, 188 Wn. App. 905, 923, 355 P.3d 345 (2015) (quoting *In re Dependency of A.C.*, 123 Wn. App. 244, 249, 98 P.3d 89 (2004)), *aff'd*, 186 Wn.2d 103, 376 P.3d 1099 (2016).

The trial court found that "[o]ffering additional services . . . would be futile given [the mother's] history of the last 17 months of being unable or unwilling to engage in services or even discuss engaging in services after she received the unfounded letter in July 2017." CP at 240 (FF 24). While the mother assigns error to this finding, the testimony of the social worker supports it, and the trial court clearly believed the social worker. We do not decide the credibility of witnesses or reweigh the evidence. *In re Dependency of A.V.D.*, 62 Wn. App. 562, 568, 815 P.2d 277 (1991). "The trial judge has the advantage of having the witnesses before him or her, and deference to the findings is of particular importance in deprivation proceedings." *K.S.C.*, 137 Wn.2d at 925.

21

The mother also recasts this assignment of error as a failure of the Department to provide social worker services tailored to her needs. Here, again, however, only the mother claimed to have a special "need." The evidence established that the social worker arranged to have the mother's appointments scheduled in the afternoon, suggested that the mother use the calendar application on her phone to keep track of appointments, and offered bus passes or gas vouchers. The trial court's findings that the mother dismissed bus travel as unworkable and failed to attend services even when her car was working are unchallenged verities on appeal.

Even if the mother had a need related to the alleged cognitive impairment first raised at the termination trial, the Department's failure to address it is excused by the mother's continuing unwillingness to engage with the social worker and take advantage of offered services.

> B.    In determining whether the mother's parent-child relationship prevented
>       J.C. from obtaining permanence, the trial court properly refused to
>       speculate about guardianship possibilities.

The mother also argues that the Department failed to prove that her relationship with J.C. was preventing him from obtaining permanence. She argues that the Department's proof failed because a guardianship could have been pursued that would not have required terminating her parental rights.

The mother necessarily admits that the Department is not required to disprove the possibility of a guardianship before parental rights can be terminated; Washington law is

22

clear on that score. *In re Welfare of R.H.* 176 Wn. App. 419, 428, 309 P.3d 620 (2013); *and see K.S.C.*, 137 Wn.2d at 930 ("Nothing in the termination statutes directs a court to consider a dependency guardianship as an alternative to termination."). But the mother then misleadingly cites *R.H.* for the proposition that "'the availability of a guardianship is material to whether the State can meet its burden to prove RCW 13.34.180(1)(f)'" arguing that in this case, guardianship was a "viable option . . . that the state failed to explore." Mot. for Accelerated Review at 22, 24 (quoting *R.H.*, 176 Wn. App. at 428).

In *R.H.*, the father moved to continue a termination trial in order to allow completion of a home study for a potential relative guardianship placement that had been identified four months before trial. 176 Wn. App. at 422-24. The Department was optimistic about the placement as a permanent option. *Id.* at 429. At issue was whether the trial court abused its discretion in denying the continuance. Finding that *evidence* about the placement then being explored was relevant to whether the Department could prove that the father's continuing relationship diminished his children's prospects for early integration into a stable and permanent home, this court reversed the termination decision and remanded.

A later decision of this court also dealt with a request to continue a termination trial and again held that, for *evidence* of guardianship to be material to the subsection (1)(f) determination, it needed to be evidence of an identified guardianship. *In re Welfare of N.M.*, 184 Wn. App. 665, 674, 346 P.3d 762 (2014).

*R.H.* and *N.M.* stand for the proposition that *evidence* of a potential identified guardianship is relevant to the subsection (1)(f) determination. They do not support the proposition that *speculation* about the possibility for a guardianship is relevant. Since the Department is not required to prove that a child has no prospect for a guardianship placement, how can speculation about whether such a prospect exists be relevant? It cannot be. How can the Department's asserted "failure to explore" a guardianship be relevant? It cannot be. In deciding whether the Department proved the element required by RCW 13.34.180(1)(f), it would have been improper for the trial court to speculate about whether guardianship either was an option, or, if it had been explored by the Department, might have been.

III.    STEP TWO:  J.C.'S BEST INTERESTS

The mother argues in part that the trial court should not have reached the best interests analysis because the evidence did not support the findings required by RCW 13.34.180(1)(d) and (f). We have rejected that premise. She argues that in any event, termination was not in J.C.'s best interests.

Washington courts "have long held that trial courts have broad discretion to determine the best interests of a child in cases touching upon a child's welfare, and such determinations are given great deference." *In re Custody of Smith*, 137 Wn.2d 1, 39, 969 P.2d 21 (1998) (Talmadge, J., concurring/dissenting), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). The child's rights to basic

nurturing, physical health, and safety are at issue, and prevail over any conflicting interest of the parent. *In re Welfare of A.W.*, 182 Wn.2d 689, 712, 344 P.3d 1186 (2015). "Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period while [the parent] sought to rehabilitate himself.'" *In re Dependency of T.R.*, 108 Wn. App. 149, 167, 29 P.3d 1275 (2001) (alterations in original) (quoting *In re A.W.*, 53 Wn. App. 22, 33, 765 P.2d 307 (1988)). As previously noted, whether termination of the parental relationship is in the child's best interest is determined by a preponderance of the evidence.

The mother argues that termination was not in J.C.'s best interest because the two have a "close and loving relationship" and it was in J.C.'s best interest to pursue a guardianship rather than termination. Mot. for Accelerated Review at 25. We have already held that the court's termination decision needs to be based on evidence, not speculation about whether guardianship was a possibility.

As for the loving relationship between the mother and J.C., witnesses testified to consistently positive interaction between the two on those occasions when the mother made it to visitation. But to paraphrase the guardian ad litem, the positive interaction demonstrated the mother's desire to see J.C., not to parent him.

The trial court found that

25

No. 36523-9-III
*In re Parental Rights to J.C.*

> [J.C.] is thriving in his placement with relatives. Being able to be adopted is in his best interest as opposed to the unchanged situation with the mother; her chaotic living and the unresolved parental deficiencies. [J.C.] is entitled to a speedy resolution of dependencies rather than remain any longer in inherently unstable foster care.

CP at 241 (FF 28). Substantial evidence supports the trial court's findings.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:


_____
Lawrence-Berrey, C.J.


_____
Fearing, J.

26